**SUNBRIDGE HEALTHCARE CORPORATION d/b/a Sunbridge Care and Rehabilitation for Linden, and Sun Healthcare Group, Inc., Appellants,**

v.

**Bruce Elliott PENNY, Independent Administrator of The Estate of Pauline E. Penny, Deceased, Appellee.**

No. 06–03–00124–CV.

Court of Appeals of Texas, Texarkana.

Submitted Dec. 8, 2004.

Decided March 11, 2005.

Before MORRISS, C.J., ROSS and CARTER, JJ.

OPINION

Opinion by Justice CARTER.

Bruce Elliott Penny, independent administrator of the estate of Pauline E. Penny, deceased, sued Brenda Patterson claiming negligence and gross negligence.[1] At the same time, he also sued SunBridge Healthcare Corporation d/b/a SunBridge Care and Rehabilitation for Linden ("SunBridge") and Sun Healthcare Group, Inc. ("Sun") claiming vicarious liability, negligence, gross negligence, violation of resident's rights, and injury to the elderly.[2] Penny sought recovery of actual and exemplary damages based on negligent treatment and care[3] of his grandmother, Mrs. Penny.

The jury returned a verdict in favor of Penny: $1,000,000.00 in pain and suffering and mental anguish, $496,934.00 for disfigurement, $496,934.00 for physical impairment, and $6,132.00 in funeral and burial expenses.

Judgment in accordance with the jury's verdict was signed June 13, 2003. Appellee filed a motion for new trial or, alternatively, a motion for remittitur or to modify. This motion was overruled by operation of law. Appellee also moved for judgment notwithstanding the verdict (JNOV), and the trial court overruled this motion.

Diana L. Faust, R. Brent Cooper, Cooper & Scully, PC, Dallas, for appellants.

Anthony Bruster, M. Chad Trammell, Nix, Patterson & Roach, LLP, Texarkana, for appellee.

1. A decedent's personal injury action survives death and may be prosecuted on his or her behalf. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 71.021(a) (Vernon 1997).

2. The jury returned a verdict finding no liability on the part of Patterson. Penny had sued Invacare, the manufacturer of Mrs. Penny's wheelchair, for products liability. The trial court granted Invacare's no-evidence motion for summary judgment and granted Invacare's motion to dismiss Appellants' cross-action against Invacare.

3. Pursuant to a stipulation based on a bankruptcy stay, Penny's allegations concern only the care Mrs. Penny received at SunBridge from October 14, 1999 to March 27, 2001. Mrs. Penny's stay actually spanned approximately seven years.

## I. FACTUAL SUMMARY

Mrs. Penny was a resident of the nursing home in Linden, Texas, operated by Sunbridge. Between November 2000 and February 12, 2001, she fell fourteen times at the nursing home. On March 27, 2001, she and another resident were taken to a physician by one staff member of the nursing home. Upon arriving at the physician's office, both residents were placed in wheelchairs. Mrs. Penny was left unattended in her wheelchair when the staff member went back to assist the other resident. Mrs. Penny's wheelchair began rolling down the sidewalk at a rapid speed. A witness saw that Mrs. Penny had a "real scared expression on her face." When the wheelchair veered off the sidewalk, Mrs. Penny was thrown onto the concrete parking lot and suffered serious injuries. Four days later, she died from those injuries.

## II. EXPERT TESTIMONY

In their first point of error, Appellants contend that the admission of the testimony of Glenda Joiner–Rogers, R.N., Ph.D., constituted harmful error that probably resulted in an improper judgment. They argue that Joiner–Rogers was not qualified to render any opinion regarding the standard of care applicable to Appellants, and further, that Joiner–Rogers' expert report failed to disclose any opinion regarding the issue of the staffing of the facility at any time before or including March 27, 2001.

## A. Admission/Exclusion of Evidence

### 1. Standard of Review

■ The admission or exclusion of evidence is a matter committed to the trial court's discretion. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). The appellate court examines the entire record to determine whether the trial court committed error and whether that error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a); *Alvarado*, 897 S.W.2d at 754; *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989).

### 2. Preservation of Error

Appellants filed their pretrial motion to exclude expert testimony in which they argued that Penny's testifying expert, Joiner–Rogers, was not qualified as an expert because she lacked the necessary knowledge, skill, experience, training, or education regarding standards of care for nursing homes or the transportation of patients. The trial court heard this motion before Joiner–Rogers' testimony. At this hearing, Appellants reurged' their argument regarding Joiner–Rogers' qualifications and also argued that her opinions regarding alleged understaffing should be excluded because those opinions were not disclosed before trial.

The grounds for Appellants' second argument, regarding Joiner–Rogers' testimony on understaffing, appear to be two-fold. Initially, Appellants challenged the reliability of her testimony on the staffing issue because she did not provide a basis for her opinion on such an issue: "[W]e don't think she has a legal basis for some of her testimony, especially as it relates to the staffing issue." Then, after the trial court's ruling on Appellants' motion to exclude, Appellants raised the inadequacy of Appellee's discovery response: "[W]e don't want her testifying to anything beyond what they've disclosed to us so far in discovery."

The trial court overruled Appellants' motion to exclude and allowed Joiner–Rogers to testify on the standards of care applicable to Appellants and alleged breaches of those standards, including the issue of understaffing.

### 3. Applicable Law: Expert Qualification

■ In a medical malpractice context, negligence and causation must be established through expert testimony, not on mere conjecture, speculation, or possibility. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 876 (Tex. 2001); *Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965).

■ Rule 702 of the Texas Rules of Evidence governs the qualification of expert witnesses. A witness offering expert testimony must be qualified by "knowledge, skill, experience, training, or education." TEX.R. EVID. 702. The proponent of the expert testimony bears the burden of proving that the witness is qualified under TEX.R. EVID. 702 and that the expert's testimony is relevant to the issues in the case and is based on a reliable foundation. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995).

■ The trial court must make certain "that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996). A medical degree or license alone is not enough to qualify a person as an expert as to every medical question. *Id.* Generally, experience in a specialized field does not qualify a witness as an expert; the witness must possess "special knowledge as to the very matter on which he proposes to give an opinion." *Id.* at 152–53. The offering party must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Id.* at 153.

■ In order to evaluate Appellants' contention, we must measure the expert's expertise against the particular opinion the expert is offering. *See id.* The same standards for qualification of a physician expert also apply to a nurse testifying as an expert. *Pack v. Crossroads, Inc.,* 53 S.W.3d 492, 505–07 (Tex.App.-Fort Worth 2001, pet. denied).

In *Pack,* the plaintiffs sued a nursing home for negligence. In support of their claims, the plaintiffs offered the testimony of nurse Alford on the issue of alleged deficiencies in care by a nursing home. *Id.* at 505. Alford had experience in nursing home investigations, knowledge of nursing home regulations, and academic and clinical training. *Id.* at 506. However, despite those qualifications, the trial court excluded Alford's testimony, holding that she was not qualified to testify as to the specific standard of care of a nursing home or the nursing home's breach of that standard of care. *Id.* at 506–07.

The Fort Worth Court of Appeals outlined Alford's qualifications: she received both a nursing diploma and a Ph.D.; she had been a staff nurse and a clinical instructor in a licensed vocational nursing program, the education director of a nursing school, and an assistant professor of nursing at a university; she was a consultant with the Department of Justice to determine why troubled government-operated nursing homes were unable to meet regulations; and she received a fellowship in the American Academy of Nursing and the Honorary Nurse Practice Award from the American Nurses Association. *Id.* at 506.

Alford testified that her experience in nursing home practice included taking students to two nursing homes under a geriatric practitioner program in 1978 in which students would provide the total resident care, filling in for a registered nurse con-

sultant for three weeks at a nursing home in the late 1970s, consulting nursing homes on resident problems, and teaching aides in nursing homes. *Id.* at 506–07. Alford's work with the Department of Justice and Texas Department of Human Services concerned nursing homes specifically and exclusively. *Id.* at 507. She had also written many published works about nursing care in general and care within nursing home settings specifically. *Id.* She testified that she worked with nurses in nursing homes to assess the conditions of residents and develop a care plan to meet residents' needs. *Id.*

Despite these credentials, the court of appeals pointed out that Alford had never worked as a staff nurse or a charge nurse in a nursing home, that she had never been an administrator of a nursing home, that she had never performed nursing functions or routine shift work in a nursing home on a daily basis, and that she had not delivered healthcare for someone other than a relative since 1991. *Id.* Therefore, the court of appeals concluded, the plaintiffs failed to establish that Alford had particular expertise in the field of nursing home standards of care. *Id.* On that basis, the trial court did not abuse its discretion in excluding Alford's testimony about standards of care for a nursing home or the defendant's breach of those standards. *Id.*

### 4. Joiner–Rogers' Qualifications

■ The first of two arguments relating to Joiner–Rogers' testimony involves her qualification as an expert on the matter before the trial court. Specifically, Appellants argue that, since Joiner–Rogers was not qualified as an expert on the standards of care applicable to Appellants, the trial court abused its discretion by admitting her testimony.

Joiner–Rogers had been a registered nurse for twenty-six years and, at the time of trial, currently divided her time between providing expert services and teaching nursing at the University of Texas. She received her bachelor's degree from Memphis State University and earned her master's and doctoral degree from the University of Texas at Austin. She is certified in the specialty of gerontological nursing by the American Nurses Credentialing Center.

In 1975, Joiner–Rogers worked in the operating room of the City of Memphis Hospital. After about a year, she then began working on the hematology/oncology floor at a Veteran's Administration (V.A.) Hospital. From 1979 to 1981, she worked at Shelby County Healthcare Center, a very large nursing home, where she held positions as supervisor of staff nurses, head nurse, utilization coordinator of staff development, and infection control coordinator. She testified that her responsibilities included training the nursing staff, utilization review to ensure compliance with Medicaid guidelines, and monitoring infections. Joiner–Rogers then returned to work at the V.A. Hospital to work on the nursing home care unit. She remained there until she was accepted to the University of Texas.

While working toward her master's degree at the University of Texas–Austin, Joiner–Rogers worked at Breckenridge Hospital, primarily in the cardiology unit and telemetry. She added that she also took care of the elderly at Breckenridge. When she finished her degree, she became the director of nursing at a nursing home for one year. She then took the position of utilization review examiner at Seton Medical Center.

While completing her doctoral degree, she worked as a teaching assistant for clinical courses. In 1988, Joiner–Rogers earned her doctoral degree. Since then, she has served as a consultant in nursing

service administration and gerontological nursing. She also worked as an assistant to the vice president for patient care services at St. David's Rehabilitation Center. She then joined the faculty at the University of Texas in 1992 as a lecturer on the conceptual basis of aging. From September 1994 through May 1997, Joiner–Rogers worked on a grant funded by the National Institutes of Health, conducting surveys at nursing homes throughout Texas. The surveys examined the financial, resident, and employee outcomes in relation to nursing management.

Since August 1997, Joiner–Rogers has been teaching again in the clinical area, focusing on gerontological nursing care at the University of Texas. She explained that she takes her students into the hospital or nursing home to perform actual care for the patients or residents. Joiner–Rogers conceded that the last time she was actually employed by a nursing home was in 1990, and during that time, she was on the floor only when needed.

Appellants argue that Joiner–Rogers' testimony shows only that she has some qualifications in providing and teaching clinical nursing care and that she has only some qualification in giving hands-on direct nursing care to a nursing home patient. Appellants contend the evidence fails to show that Joiner–Rogers has "any education, training, or experience in nursing home administration and management, including formulating, implementing, and enforcing polices and procedures, budgets, or staffing criteria." They argue that the record shows no evidence Joiner–Rogers "had ever been licensed or employed as a nursing home administrator, or in any management role beyond supervision of nursing staff."

#### 5. Joiner–Rogers Was Qualified as an Expert

First, there is an obvious and relevant distinction between *Pack* and the instant case. In *Pack*, the appellants were challenging the *exclusion* of expert testimony. *Id.* at 505–07. Here, however, we are reviewing the trial court's *admission* of expert testimony for an abuse of discretion. That being said, under an abuse of discretion standard of review, we allow the same amount of deference for the trial court's decision to admit the evidence here as the Fort Worth Court of Appeals allowed for the decision to exclude in *Pack*.

Second, Joiner–Rogers' qualifications indicate she has had more specialized experience and training in the study and practice of nursing in a nursing home environment than did Alford in *Pack*. Specifically, the experience absent in *Pack* is shown in the record here. Joiner–Rogers worked as a staff nurse and as a supervisor of staff nurses at Shelby County Healthcare Center. She also served in other administrative positions. She served as director of nursing in a nursing home for one year. Additionally, she served as a consultant in nursing services administration and gerontological care. Her three years of grant work focused on administration and management decisions' effect on resident care. The trial court did not abuse its discretion by admitting Joiner–Rogers' expert testimony.

#### B. Discovery Issue

In their second argument related to Joiner–Rogers' testimony, Appellants argue that, even if Joiner–Rogers was qualified to give expert testimony, her opinions regarding the issue of understaffing should have been excluded due to the failure of Appellee to disclose those opinions during discovery. This argument should be distinguished from the initial basis for excluding Joiner–Rogers' testimony on understaffing. Again, Appellants first chal-

lenged the reliability of the expert testimony, arguing that Joiner–Rogers had no basis for her opinion on understaffing. It was not until after the trial court overruled Appellants' motion to exclude Joiner–Rogers' testimony in terms of her qualifications and reliability of her opinions that Appellants raised the issue of the adequacy of Appellee's discovery response.

### 1. Applicable Law: Scope of Discovery for Expert Opinions

A party must disclose the following for any testifying expert:

(1) the expert's name, address, and telephone number;

(2) the subject matter on which a testifying expert will testify;

(3) the facts known by the expert that relate to or form the basis of the expert's mental impressions and opinions formed or made in connection with the case in which the discovery is sought, regardless of when and how the factual information was acquired;

(4) the expert's mental impressions and opinions formed or made in connection with the case in which discovery is sought, and any methods used to derive them;

(5) any bias of the witness;

(6) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of a testifying expert's testimony;

(7) the expert's current resume and bibliography.

TEX.R. CIV. P. 192.3(e). Additionally, a party may request disclosure of any or all of the following regarding any testifying expert:

(1) the expert's name, address, and telephone number;

(2) the subject matter on which the expert will testify;

(3) the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

(4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party:

(A) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

(B) the expert's current resume and bibliography;....

TEX.R. CIV. P. 194.2(f). A party has an ongoing duty to supplement or amend its discovery responses:

If a party learns that the party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct, the party must amend or supplement the response:

(1) to the extent that the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses, and

(2) to the extent that the written discovery sought other information, unless the additional or corrective information has been made known to the other parties in writing, on the record at a deposition, or through other discovery responses.

TEX.R. CIV. P. 193.5.[4] The trial court must exclude evidence that was not disclosed in discovery:

4. An amended or supplemental response must

be made in a timely manner after the party

A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:

> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

> (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

Tex.R. Civ. P. 193.6(a).

### 2. Dates and Content of Joiner–Rogers' Expert Report, Deposition, and Testimony

Joiner–Rogers' February 6, 2003, expert report detailed her opinion that SunBridge breached the applicable standard of care by failing to provide adequate assistance and supervision to prevent accidents, which directly caused Mrs. Penny's pain, suffering, and death.

At her deposition April 29, 2003, the following exchange occurred between Appellants' attorney and Joiner–Rogers:

> Q.... You talk about supervision problems, that they probably should have had more than one person supervising the transfer. But there's no mention of staffing problems. And I want to make a distinction. Or do you believe there's a distinction?

> A. I believe it's all a part of protecting her safety, which is an over—over-arching an opinion. That's just support. Specifically, staffing was not mentioned, but it is a part of why I think these things have happened, as a part of the failure to do fall prevention and to protect her safety.

Joiner–Rogers repeated these same opinions at trial without objection as to the adequacy of the discovery response. Appellants cross-examined Joiner–Rogers regarding the basis for her opinions, including her opinion that staffing played a role in Mrs. Penny's injuries.

### 3. Appellants Waived Their Complaint as to Inadequate Discovery Responses

Penny responds to Appellants' contention by arguing that Appellants waived any error regarding the adequacy of discovery responses. In their written motion, Appellants do not raise the issue of a failure to disclose Joiner–Rogers' opinion. Appellants initially only raised the issues that Joiner–Rogers was not qualified and that she had not provided a sufficient basis for her opinions regarding staffing. After the trial court overruled Appellants' Daubert[5] motion, counsel stated, "[W]e don't want her testifying to anything beyond what they've disclosed to us so far in discovery." and "[W]e believe that they should be limited to what's in the depo and in that report. And they can't go beyond, you know, bringing up all sorts

---

discovers the necessity for such a response. Except as otherwise provided by these rules, it is presumed that an amended or supplemental response made less than thirty days before trial was not timely made. An amended or supplemental response must be in the same form as the initial response and must be verified by the party if the original response was required to be verified by the party, but the failure to comply with this requirement

does not make the amended or supplemental response untimely unless the party making the response refuses to correct the defect within a reasonable time after it is pointed out. See Tex.R. Civ. P. 193.5(b).

5. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

of issues that she's never told us about or we haven't had time to get prepared for."

█ If the complaining party is aware of the alleged inadequacies of discovery responses before trial, the complaining party cannot wait until trial to raise the issue.[6] *Morua,* 979 S.W.2d at 619–20; *Interceramic, Inc. v. S. Orient R.R. Co.,* 999 S.W.2d 920, 930 (Tex.App.-Texarkana 1999, pet. denied). Appellants became aware of this alleged deficiency, at the latest, April 29, 2003, at Joiner–Rogers' deposition, but only raised the issue during trial right before Joiner–Rogers' testimony at the June 4, 2003, hearing on Appellants' motion to exclude, based on other grounds. Appellants did not reiterate their objection on this specific basis to Joiner–Rogers' testimony at trial.

We conclude that Joiner–Rogers was properly qualified as an expert and that Appellants failed to preserve the discovery issue for review. Accordingly, we overrule Appellants' first point of error.

## III. SUFFICIENCY OF THE EVIDENCE TO SUPPORT JURY'S FINDINGS AGAINST SUN HEALTHCARE GROUP

In their second point of error, Appellants contend the record contains legally or factually insufficient evidence to support the jury's findings against Sun HealthCare Group, Inc., in response to Questions 1 and 2.

### A. Standards of Review

█ In reviewing the legal sufficiency of the evidence, we must consider all of the evidence in the light most favorable to the prevailing party and must indulge every reasonable inference in favor

of the prevailing party. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). We will sustain a no-evidence point of error under any one of four scenarios: 1) the record discloses a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or rule of evidence from giving weight to the only evidence offered to prove a vital fact; 3) the only evidence offered to prove a vital fact is no more than a mere scintilla; or 4) the evidence establishes conclusively the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). Any evidence supporting the jury's finding that is of probative value and that is more than a scintilla is legally sufficient to uphold the jury's finding. *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

When reviewing the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence for and against the jury's finding, bearing in mind that the jury is the sole judge of the credibility of witnesses and is entitled to accept or reject any testimony it wishes, as well as decide the weight to be given to the testimony. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). We will set aside the jury's verdict only when the evidence supporting the jury's finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

### B. Penny's Allegations Against Sun

In his petition, Penny alleged that Sun had a duty "to allocate its resources and exercise its fiscal policies with reasonable care, so as to prevent the infliction of harm on the residents of nursing homes operated by its subsidiaries." He alleged further

---

**6.** The proper procedure would have been to file a pretrial objection or a pretrial motion to compel or for sanctions. *State Farm Fire &*

*Cas. Co. v. Morua,* 979 S.W.2d 616, 619–20 (Tex.1998).

that Sun "breached this duty by failing to allocate sufficient financial resources to SunBridge Healthcare Corporation for residents' needs to be meet [sic], resulting in harm to Pauline Penny as discussed throughout this Petition." The crux of Penny's allegations against Sun, according to his brief, is that Sun knew resident care would suffer if it did not provide enough money to properly staff the nursing home.[7]

## C. Jury's Findings Against Sun

The jury answered Question 1 affirmatively, finding that the negligence of each party proximately caused the injuries to Mrs. Penny. The jury allocated responsibility in Question 2, finding that Sun was seventy-five percent responsible and that SunBridge was twenty-five percent responsible.

## D. Preservation of Error

Appellants moved for a directed verdict. Sun argued that there was not legally sufficient evidence it owed a duty to Mrs. Penny, that there was no evidence Mrs. Penny had any expectation Sun would provide for her care, and that there was legally insufficient evidence Sun breached any duty owed to Mrs. Penny.

In its motion for JNOV, Sun argued specifically that the evidence was legally insufficient to support the jury's answers to Questions 1 and 2. In other words, Sun argued that the evidence was legally insufficient to support the jury's finding that Sun had any direction or control over the staff at SunBridge or the daily operations of SunBridge, particularly those operations concerning staffing or budgeting. The trial court overruled Appellants' motions for directed verdict and for JNOV. Appellants argued the factual sufficiency of the evidence on each of these matters in their motion for new trial, which was overruled by operation of law.

## E. Applicable Law: Elements of Negligence of Action

Penny sued Sun, as a corporate entity rather than a healthcare provider, for ordinary negligence. Therefore, Penny was required to prove that Sun owed a duty, the breach of which proximately caused injury to Mrs. Penny. *See Southwest Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 273–74 (Tex.2002); *Ortiz v. Shah,* 905 S.W.2d 609, 610 (Tex.App.-Houston [14th Dist.] 1995, writ denied).

## F. Documentary Evidence of Sun's Control and Management of SunBridge

Penny introduced several documents into evidence that demonstrate Sun maintained significant control over its subsidiary, SunBridge. For instance, he introduced Sun's analyses of SunBridge's revenue and expenses and Sun's detailed reports monitoring every hour worked by staff at the Linden facility. He also introduced several other Sun reports detailing each SunBridge expenditure. Additionally, the record contains Sun memoranda that demonstrate Sun's authority over Sun expenditures. Specifically, Sun's "Cost Report" discussed in detail every function of SunBridge's Linden facility operation. The "Cost Report" indicates that the CEO of Sun has "[d]irect supervision of all financial and facility operations."

## G. Summary of Testimony on Budgeting, Staffing Levels, and Impact of Shortages

### 1. Dr. Reginald LeGrow

---

7. Penny did not sue Sun as a medical care provider. Therefore, no expert testimony was required under the applicable version of the *Medical Liability and Insurance Improvement Act* (MLIIA).

LeGrow was Mrs. Penny's treating physician and the medical director of the nursing home. He testified that corporations in the business of operating nursing homes have a responsibility to allocate sufficient funds to provide staff to meet the needs of the residents. He testified that it was vital to maintain a staff that could supervise nursing home residents who were at a high risk of falling.

### 2. Brenda Patterson

Patterson worked for SunBridge for ten to eleven years. She acted as CNA coordinator. The director of nursing directed her with respect to her duties to make certain there was enough staff at the facility. She also ran the CNA budget. If she needed additional CNAs, they would have been employed. There are procedures in place to call in temporary/emergency CNAs in the event of a shortage.

Patterson explained that census, the population of the facility, dictates the number of CNAs required. She was instructed to staff according to the State-mandated minimums. She heard complaints that the facility needed more staff at least once a week. She went through the designated channels to follow through on complaints, but was told to make do with what they had. It is not clear, however, who gave her this instruction.

Patterson testified that SunBridge offered the lowest pay in the area. She testified that she understood Sun, rather than SunBridge, was her employer. When census would go down, Patterson had to cut CNA hours. Patterson does not remember asking for a coworker to assist her during the transport of Mrs. Penny and the other resident. She testified, however, that she would have liked to have had help in the transport. The accident report cited "improper procedures" as the cause of the accident.

By reference to the documents showing punch details, Patterson testified there were nine CNAs and herself on duty the morning of Mrs. Penny's transport. According to Patterson, however, not all CNAs worked on the floor during a shift.

### 3. Julie Dillman

Dillman, director of human resources for Sun, testified by deposition that she went to SunBridge to audit the facility, to deal with employee issues, and to ensure that Sun was paying employees correctly. She further testified that Sun would track labor hours at Sun's nursing homes and would encourage any facility exceeding its budgeted hours to "get back within budgeted labor hours."

### 4. Linda Powell

Powell, SunBridge's former payroll clerk from 1999 to 2001, testified she attended regional meetings at which Sun repeatedly directed all the heads of the departments of regional facilities to cut the budget. Throughout a given week, she faxed budget reports, nursing reports, and expense reports to Donna Knight, the regional manager. She testified that SunBridge was in bankruptcy.

The facility was always short-handed. Powell described a high turnover rate among the employees at the Linden facility. She testified that the district manager set staffing levels. It is not clear, however, whether this was a Sun or SunBridge manager. She, too, testified that SunBridge paid its CNAs less than most area facilities. Powell stated that Patterson expressed to Powell that she was not able to find anyone to help her transport Mrs. Penny and the other resident on March 27, 2001, because the staff was short-handed. Powell conceded that staffing records indicate that ten CNAs were on duty the morning Mrs. Penny was transported.

### 5. Michael Berg

Berg served as Sun's corporate counsel. He testified that revenue from the facility went into an account over which both Sun and SunBridge had access and control.

### 6. Glenda Joiner–Rogers

Joiner–Rogers testified that having adequate staff is necessary to meet resident needs. When staff is inadequate or incompetent, accidents and illnesses will increase.

### 7. Darrell Smith

Smith served as administrator at Sun-Bridge's Linden facility from 1997 to 2001. He testified there was never pressure to keep staffing below budget at the expense of resident care. He also testified staffing and supply levels were adequate.

### 8. Drema Thompson

Thompson is SunBridge's regional manager for the region covering Texas, Oklahoma, and Louisiana. Her testimony demonstrated that Sun was active in its financial and operational control of Sun-Bridge. She testified that, in the month before Mrs. Penny's fatal fall, the Linden facility exceeded the budget for nursing expenses.[8] The management team at Sun-Bridge's Linden facility would have been made aware that they were over budget in the few months preceding Mrs. Penny's fall. The management, she explained, makes the decisions that impact resident care.

### 9. Brenda Phillips

Phillips was an LVN at SunBridge from March 25, 2000 to February 2, 2002. She testified to the independent nature of Mrs. Penny. She also testified that the facility was constantly understaffed, sometimes only having one or two aides. She complained to the director of nursing about the staffing. Working conditions were poor in that the staff was paid poorly and the facility did not maintain an adequate supply of hygiene and grooming products for the residents. Even if sufficient help was hired, these conditions contributed to the high employee turnover rate at the facility.

According to Phillips, these conditions had an effect on Mrs. Penny. Mrs. Penny would use her call button to summon help, but after waiting for some time, she would try to get up on her own. This pattern would cause her to fall as she tried to get out of bed. Phillips recalled that it appeared Mrs. Penny fell in her own urine on one occasion after no one came to her assistance. Phillips stated that the only time the facility would have sufficient staff would be when the State came to evaluate or investigate the facility. She stated that Patterson was devastated by the incident that was the cause for this lawsuit and that Patterson told her that she had asked for help with the transport. She also testified that the State investigated the SunBridge facility several times. Phillips stated she did report the staffing and resulting care problems to the State several times.

### 10. Jacqueline Jones

Jones is a former CNA at SunBridge, having worked there on at least three occasions.[9] She worked during Mrs. Penny's stay at SunBridge. Jones testified that Mrs. Penny was known to get out of her wheelchair and try to do things for herself.

---

8. In February 2001, the Linden facility was spending $29.92 on nursing per patient per day when the budget allowed for $28.98 per patient per day. Overall, however, looking at the yearly budget, the facility was operating below the budget allocations for nursing services.

9. After two prior short terms of employment with SunBridge, Jones was going through orientation on the day of Mrs. Penny's fatal accident. She testified she did treat Mrs. Penny during earlier employment and observed unsuitable care during that time.

Staff was short-handed at least three times a week. Jones complained to the director of nursing concerning the shortage of staff. Jones admitted that she, as directed, went back to fill in blanks left in residents' ADL (Activities of Daily Living) charts.

### 11. Bruce Penny

Penny testified that the family often took Mrs. Penny to her doctor's visits but were not always able to do so. Beginning in January 2001, however, the nursing home occasionally indicated that it had no one to take Mrs. Penny to regular doctor's visits and impliedly encouraged the family to transport her.

### H. Lack of Expert Testimony on Sun's Standard of Care and Breach

Penny alleged that Sun failed to fulfill its duty to provide adequate funding to the facility and that such failure was the proximate cause of the staffing shortages leading to Mrs. Penny's injuries. Penny presented Joiner–Rogers' expert testimony in support of his allegations against Sun-Bridge, but provided no expert testimony with respect to his allegations against Sun. He argues that expert testimony was unnecessary since Sun was not a medical provider governed by the MLIIA. While that is true, there is a more general inquiry into the necessity of expert testimony outside the medical provider context.

■ Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layperson. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982). The question then becomes whether the law requires expert testimony by which the jury can

evaluate the allegations that Sun failed to provide adequate funding to maintain a staff sufficient to supervise the residents.

Put simply, we must decide whether a jury has the experience to evaluate corporate funding of a nursing home and whether the funding was adequate to meet the residents' needs. Again, the issue as to Sun's liability does not involve whether the staff was sufficient or whether another employee should have accompanied Patterson while she transported Mrs. Penny and the other resident. Rather, the issue concerns whether Sun was negligent in providing insufficient money to SunBridge for staffing and, if so, whether such failure was a proximate cause of Mrs. Penny's injuries and death.

■ In some instances, expert witness testimony is not required to establish the standard of care if the conduct involves nonmedical, administrative, or routine care. *Golden Villa Nursing Home, Inc. v. Smith*, 674 S.W.2d 343 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) (failure to properly supervise a resident that darted onto a highway injuring the person colliding with him); *Sisters of Charity of the Incarnate Word, Houston, Tex. v. Gobert*, 992 S.W.2d 25 (Tex.App.-Houston [1st Dist.] 1997, no pet.) (patient in hospital sexually assaulted by a person with well-known problems). In these instances, a jury is competent to determine and apply a reasonable care standard.

■ In contrast, this case involves corporate funding, nursing home budgets, and staffing level standards—issues not within the common knowledge or experience of the jury.[10] Without some guidance as to

---

10. There is significant and compelling evidence that Sun was very involved in and exercised significant control over the financial operations of SunBridge, including those related to the facility's staffing budget. Howev-

er, this evidence is not relevant to Sun's own liability as alleged and is more relevant to issues pertaining to piercing the corporate veil in a way so as to make Sun liable for the

how much money a reasonable parent corporation in the business of operating nursing homes should have allocated to its subsidiary for staffing of the subsidiary's nursing home facilities, the jury has no basis to establish a standard of care for Sun. Without such expert testimony, there is no probative evidence that is more than a scintilla. Accordingly, we conclude that the evidence supporting the jury's answers with respect to Sun is legally insufficient and render judgment that Penny take nothing from Sun.

## IV. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT JURY'S AWARDS

In analyzing Appellants' third point of error we are asked to determine whether the record contains legally or factually sufficient evidence to support the jury's awards of $1,000,000.00 in physical pain and mental anguish, $496,934.00 for disfigurement, $496,934.00 for physical impairment, or whether the amounts should be remitted. Appellants ask us to review the evidence to support the entire amounts awarded against both Sun and SunBridge.

### A. Standards of Review

■ Appellants' argument that there is no evidence to support the jury's award raises the legal sufficiency of the evidence. The contention that the jury's award was excessive raises the factual sufficiency of the evidence to support the jury's award. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998).

■ In determining whether damages are excessive, we apply the same test as for any factual insufficiency question, examining all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 851 (Tex.2000); *Ellis,* 971 S.W.2d at 407; *C.M. Asfahl Agency v. Tensor, Inc.,* 135 S.W.3d 768 (Tex.App.-Houston [1st Dist.] 2004, no pet.).

■ We recognize that the amount of damages to be awarded here is primarily a matter for the jury to determine.[11] No fixed rule exists for measuring these types of damages. *Baptist Mem'l Hosp. Sys. v. Smith,* 822 S.W.2d 67, 78 (Tex. App.-San Antonio 1991, writ denied). Each case must be measured by its own facts, and considerable discretion and latitude must be given to the jury's award. *Weidner v. Sanchez,* 14 S.W.3d 353, 372 (Tex.App.-Houston [14th Dist.] 2000, no pet.). In considering and weighing the evidence, we must defer to the fact-finder as the final determiner of the credibility of witnesses and the weight to give their testimony. *See Ellis,* 971 S.W.2d at 407. A verdict will be set aside on appeal only where the record clearly indicates that the award was based on passion, prejudice, or improper motive, or is so excessive as to shock the conscience. *Transit Mgmt. Co. of Laredo v. Sanchez,* 886 S.W.2d 823, 826 (Tex.App.-San Antonio 1994, no writ);

---

negligence of SunBridge, an issue not before us.

**11.** If the jury returns a grossly excessive or inadequate award, an appellate court will intervene, in accordance with recognized principles of law. *Holloway v. County of Matagorda,* 667 S.W.2d 324, 327 (Tex.App.-Corpus Christi 1984), *aff'd,* 686 S.W.2d 100, 101 (Tex.

1985); *Rowan & Hope v. Valadez,* 258 S.W.2d 395, 400–01 (Tex.Civ.App.-San Antonio 1953, writ ref'd n.r.e.). If we find the evidence insufficient, we may affirm conditioned on a remittitur or remand for further proceedings. *See* Tex.R.App. P. 46.3; *Bocquet v. Herring,* 972 S.W.2d 19, 21–22 (Tex.1998).

*Weingarten, Inc. v. Gauthier,* 305 S.W.2d 181 (Tex.Civ.App.-Beaumont 1957, no writ). As long as sufficient probative evidence exists to support the jury's verdict, this Court will not substitute its judgment for that of the jury. *See Ellis,* 971 S.W.2d at 407.

## B. Jury's Award for Physical Pain and Mental Anguish

Question 3a of the jury charge asked the jury to award an amount for physical pain and mental anguish as one element of damages. The jury established damages at $1,000,000.00 for conscious pain and emotional pain, torment, and suffering experienced before death as a result of the occurrence in question. Appellants argue there is legally and factually insufficient evidence to support the jury's award.

### 1. Multi–Element Damage Award

■ Damages for physical and mental injuries are separate and distinct. *Southwest Tex. Coors, Inc. v. Morales,* 948 S.W.2d 948, 954 (Tex.App.-San Antonio 1997, no writ) (Green, J., concurring). Here, however, the jury charge included a question that concerned both "conscious physical pain and emotional pain, torment, and suffering...." When a damage issue is submitted in broad form, ascertaining the amount the jury awarded for each element of damages is difficult, if not impossible. *See Wal–Mart Stores, Inc. v. Garcia,* 30 S.W.3d 19, 24 (Tex.App.-San Antonio 2000, no pet.); *Brookshire Bros. v. Lewis,* 997 S.W.2d 908, 921–22 (Tex.App.-Beaumont 1999, pet. denied). Therefore, an appellant who seeks to challenge a multi-element damage award on appeal must address each element and show the evidence is insufficient to support the entire award. *See Garcia,* 30 S.W.3d at 24; *Lewis,* 997 S.W.2d at 922. If an appellant fails to address an element of damages, the appellant waives the sufficiency challenge.

*See Garcia,* 30 S.W.3d at 24; *Lewis,* 997 S.W.2d at 922. Here, Appellants challenge the evidence as to both physical and mental injuries to Mrs. Penny.

### 2. Pain and Suffering

#### a. Applicable law

■ The presence or absence of pain, either physical or mental, is an inherently subjective question. *Dollison v. Hayes,* 79 S.W.3d 246, 249 (Tex.App.-Texarkana 2002, no pet.). In Texas, only pain consciously suffered and experienced is compensable. *S. Pac. Transp. Co. v. Luna,* 730 S.W.2d 36, 38 (Tex.App.-Corpus Christi 1987, no writ).

■ The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *Dollison,* 79 S.W.3d at 249. Because there are no objective guidelines to assess the monetary equivalent to such injuries, the jury is given a great deal of discretion in awarding an amount of damages it deems appropriate. *Texarkana Mem'l Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1997); *Dollison,* 79 S.W.3d at 249.

■ A party may establish the existence of conscious pain and suffering by circumstantial evidence. Pain and suffering may be inferred or presumed as a consequence of severe injuries. *City of Austin v. Selter,* 415 S.W.2d 489, 501 (Tex. Civ.App.-Austin 1967, writ ref'd n.r.e.).

■ In some instances, the injuries are so substantial and the symptoms are so objective that an award of damages for pain and suffering is clearly supported. *Dollison,* 79 S.W.3d at 249–50. In other cases, the objective indicia of injury are either less obvious or entirely absent. The jury may deny such damages if the inju-

ries sustained are subjective in nature. *Id.* at 250; *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 805 (Tex. App.-Dallas 1988, no writ).

In *Canales v. Bank of California*, 316 S.W.2d 314, 318–19 (Tex.Civ.App.-Eastland 1958, writ ref'd n.r.e.), the Eastland Court of Appeals found the evidence insufficient to sustain an award for "conscious" pain and suffering of the decedent before his death. The court of appeals stated:

> The only pain for which there can be a recovery is that which the child consciously experienced, and events that occurred subsequent to a merciful unconsciousness did not prolong nor increase the suffering and are not compensable.

*Id.* at 318 (citing *Sharpe v. Munoz*, 256 S.W.2d 890, 892 (Tex.Civ.App.-San Antonio 1953, writ ref'd n.r.e.)).

In *Luna*, the jury heard conflicting evidence on whether a fatally injured four-year-old boy consciously suffered pain. 730 S.W.2d at 38. Objective medical evidence indicated that the boy was not responsive to painful stimuli. *Id.* The father testified that his son was responsive to him at least to a degree during his son's last weeks. *Id.* The Corpus Christi Court of Appeals held that the father's testimony that the child responded by opening his eyes was certainly some evidence the child was conscious and was able to experience pain. *Id.*

In *Russell v. Ramirez*, 949 S.W.2d 480, 491 (Tex.App.-Houston [14th Dist.] 1997, no writ), there was no evidence the decedent ever regained consciousness from the time he was taken from the accident scene until he died twelve days later. The only evidence of "conscious" pain and suffering in the record is found in counsel's argument before the trial court concerning the admissibility of the decedent's medical records, one of which made a reference to a motor response of withdrawing from a painful stimuli. *Id.* at 491–92. The medical records were not part of the appellate record, and there was no testimony as to the meaning of this neurological response and no evidence that such a reaction was a conscious reaction to pain. *Id.* at 491.

Since there was no evidence from any source that the decedent in *Russell* ever regained consciousness or displayed any conscious signs of pain or suffering, the court of appeals found there was no evidence to sustain the jury's finding that the decedent experienced conscious pain and suffering before he died. *Id.* at 491–92. Therefore, the trial court's JNOV modifying the judgment to eliminate the $50,000.00 jury award for the decedent's conscious pain and suffering was correct, and the court of appeals affirmed the trial court's judgment. *Id.* at 492.

**b. Evidence of Mrs. Penny's Pain and Suffering**

 The record contains evidence of Mrs. Penny's pain and suffering as a result of her falls before March 27, 2001. The record shows she fell at least fourteen times during her last nine months at Sun-Bridge. As a result of these falls, Mrs. Penny suffered bruises, open wounds, and tears to her skin. Dr. LeGrow testified that skin tears can be painful and that he was certain Mrs. Penny experienced some pain from the skin tears resulting from her falls. Penny testified that Mrs. Penny cried as a result of one fall in the bathroom early in 2001.

Defense expert on nursing, Connie Cheren, testified that Mrs. Penny did not suffer any major injuries as a result of her falls at the facility. She offered her opinion that skin tears are not considered major injuries. Appellants also point to Mrs. Penny's mental deterioration to support their contention that Mrs. Penny may have

been unable to experience the sensation of pain from these skin tears.

There is also evidence of Mrs. Penny's pain and suffering resulting from the fall March 27, 2001. Jody White, a clerk at the pharmacy attached to the clinic to which Patterson was taking Mrs. Penny, witnessed the incident from the pharmacy window. White testified that Mrs. Penny looked "real scared" as she traveled in the wheelchair alone at a high rate of speed. Mrs. Penny veered off the sidewalk, fell onto the concrete head-first, then fell down the stairs leading into the parking lot, where Mrs. Penny landed face-first. White testified that Mrs. Penny was bleeding profusely from her nose.

Dr. LeGrow testified that, in some instances, a brain may be injured to the point at which normal pain responses are not present. He could not say when or if Mrs. Penny lost pain perception. He stated that Mrs. Penny's loud moaning and picking at her sheets could be expressions of pain. He could not state that Mrs. Penny did not experience pain and suffering.

Mrs. Penny was crying after the fall. She was able to walk with help when she was admitted to the emergency room March 27, 2001. On admission to the emergency room, Mrs. Penny was alert and oriented. While in her hospital bed following the fall, Mrs. Penny moaned a great deal. She was restless and attempted to pull the I.V. from her arm. The record indicates that she squeezed and held onto Bruce Penny's hand.

Appellants point to the nurses' overnight notes that indicated Mrs. Penny was in no acute distress. Notes for the day following the fall reveal that Mrs. Penny was calm and that she did not respond to verbal stimuli and only very little to painful stimuli.

Even though each case must be judged on its own unique facts, it is proper to consider other approved awards in similar cases to determine if an award for pain and suffering is excessive. *Landreth v. Reed*, 570 S.W.2d 486, 492 (Tex.Civ.App.-Texarkana 1978, no writ). Recently, the Amarillo court has considered the excessiveness of damages for claims resulting from an elderly woman's injuries and death originating in a nursing home. *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214 (Tex.App.-Amarillo 2003, no pet.). There, a patient of the nursing home fell July 4 and broke her legs. She died July 20 as a result of an untreated bladder infection. The jury awarded $4.5 million in damages for pain and mental anguish. The Amarillo court suggested a remittitur of $3.5 million, making the approved award $1 million for pain and mental anguish.

*The duration of the pain and mental anguish is an important consideration.* In this case, Mrs. Penny lived four days after the injury of March 27, 2001. In *Guzman v. Guajardo*, 761 S.W.2d 506 (Tex.App.-Corpus Christi 1988, writ denied), a young boy was killed in an automobile accident. He lived and endured severe pain for "at least fifteen minutes." *Id.* at 512. Additionally, the court found that he was "terrified." An award of $600,000.00 was upheld. Likewise, in *Wilhelm v. Flores*, 133 S.W.3d 726 (Tex.App.-Corpus Christi 2003, pet. filed), an award of $1 million for pain and mental anguish was upheld when a young man was stung by a bee, suffered anaphylactic shock and died within thirty to fifty minutes. Another case on the issue of duration of pain is *Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420 (5th Cir.1992). Applying Texas law, the court there held that damages of $1 million for a child's pain and suffering was not excessive when a garage door

closed on him, causing his death. The evidence established that he survived between three minutes to several hours.

### 3. Mental Anguish

#### a. Applicable law

■ The Texas Supreme Court, concerned with the subjective nature of mental anguish damages, has admonished courts to closely scrutinize such awards. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex.1997); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995). In most cases, plaintiffs may not recover mental anguish damages unless they introduce "direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Giles*, 950 S.W.2d at 54; *Woodruff*, 901 S.W.2d at 444. This standard ensures that fact-finders are provided "with adequate details to assess mental anguish claims." *Giles*, 950 S.W.2d at 54.

■ Mental anguish damages must be supported by direct evidence of the nature, duration, or severity of the plaintiffs' anguish, thus establishing a substantial disruption in the plaintiffs' daily routine, or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). In addition to evidence of compensable mental anguish, evidence must also be presented to justify the amount awarded. *Id.* Juries must find an amount that fairly and reasonably compensates for the loss. *Id.*

Historically, some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish. *Woodruff*, 901 S.W.2d at 445. Generally, qualifying events have demonstrated a threat to one's physical safety or reputation or involved the death of, or serious injury to, a family member. *Id.*

The court in *Woodruff* held that Parkway's negligence and the resulting property damage could not alone support the mental anguish damages. However, we distinguish *Woodruff* from the case at bar. At issue in *Woodruff* was the sufficiency of the evidence to show mental anguish when the Woodruffs' house was flooded. The *Woodruff* court also held that there was no evidence, direct or circumstantial, other than the fact of the flooding itself, to support an award of mental anguish. The Texas Supreme Court acknowledged that the flooding of the home certainly disrupted the Woodruffs' lives temporarily, but concluded that, under substantive law, this type of disruption would not support an inference that compensable mental anguish occurred. *Id.*

#### b. Evidence of Mrs. Penny's mental anguish

■ Penny testified that his grandmother cried as a result of an earlier fall and had grown scared of the staff. White testified to the expression of fear on Mrs. Penny's face as she rolled alone in the wheelchair. Additionally, Mrs. Penny's constant moaning and agitation during her final days indicate she suffered mental anguish. Dr. LeGrow testified that Mrs. Penny cried in the parking lot after the fall.

Appellants rely on *Woodruff* to support their contention that the evidence is insufficient to support the jury's award for mental anguish. *Woodruff* actually lends more support to Penny's position. Consistent with *Woodruff*, the severity of Mrs. Penny's fatal injuries is probably sufficient, in and of itself, to support an inference that mental anguish accompanied those injuries. Additionally, the record contains other evidence that would support

the jury's award, evidence that was absent in *Woodruff.* *Id.*

Many cases have held that consciousness of approaching death is a proper element to be considered in evaluating mental suffering. *See Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630, 634–35 (Tex.1986) ($500,-000.00 awarded to each of four decedents for mental anguish suffered from the time a plane broke up until it crashed); *Mo. Pac. R.R. Co. v. Lane,* 720 S.W.2d 830, 833 (Tex.App.-Texarkana 1986, no writ) (argument that decedent was apparently killed instantly fails to consider terror and consequent mental anguish in the six to eight seconds when he faced imminent death). Here, the evidence shows that Mrs. Penny had a "real scared expression on her face" as she was speeding down the sidewalk toward the concrete steps and parking lot. While it may not have been as certain that she was staring death in the face as in a falling airplane, it is certainly reasonable to conclude that she suffered real mental anguish as her wheelchair careened downhill in an uncontrolled manner directly toward a concrete parking lot landing. In fact, she did suffer fatal injuries from the incident.

After thoroughly reviewing the entire record, we cannot say that the jury's answer to the damage issues concerning Mrs. Penny's pain and mental anguish are against the great weight and preponderance of the evidence. We conclude that the evidence was legally and factually sufficient to support the jury's award. The record does not clearly indicate that the verdict was so excessive as to be based only on the jury's passion, prejudice, or improper motive.

## C. Jury's Award for Disfigurement

Appellants contend that there is no evidence of disfigurement before the March 27, 2001, fall and that, therefore, the evidence is insufficient to support the jury's award.

### 1. Applicable Law: Definition of Disfigurement

██ Disfigurement has been defined as "that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Goldman v. Torres,* 161 Tex. 437, 341 S.W.2d 154, 160 (1960). Expert testimony is not a prerequisite to the award of damages for disfigurement. *Sanchez,* 886 S.W.2d at 826.

### 2. Evidence of Mrs. Penny's Disfigurement

██ Photographs show a significant swelling, distortion, and discoloration of Mrs. Penny's face and hands as a result of the March 27, 2001, fall. According to Penny, it appeared as though Mrs. Penny also had bitten through her tongue or had bitten off part of her tongue.

██ Perhaps there is no evidence of disfigurement resulting from falls before March 27, 2001, but the record does contain sufficient evidence of disfigurement resulting from the fall March 27, 2001. This fall represents one of the acts or omissions on which Penny bases his negligence claims. Therefore, there is some probative evidence to support an award for disfigurement. *See id.* at 824 (a discoloration on one's face is sufficient evidence for award for disfigurement). However, the damages for disfigurement must be measured from the date of the injury until the time the disfigurement is expected to end. *See Armellini Express Lines of Fla., Inc. v. Ansley,* 605 S.W.2d 297, 311 (Tex.Civ. App.-Corpus Christi 1980, writ ref'd n.r.e.); *Texas Farm Prods. Co. v. Leva,* 535 S.W.2d 953 (Tex.Civ.App.-Tyler 1976, no writ) (jury questions determine the past

and future disfigurement damages separately). Here, the duration of the disfigurement damages was only four days. We cannot find that the evidence is factually sufficient to support an award of damages of $496,934.00, and we suggest a remittitur for the disfigurement damages of $396,934.00.

### D. Jury's Award for Physical Impairment

The jury awarded Penny $496,934.00 for Mrs. Penny's physical impairment. Appellants challenge the legal and factual sufficiency of the evidence to support this award.

#### 1. Applicable Law: Definition of Physical Impairment

In reviewing this point of error, an appellate court should consider all the evidence that bears on this category of damages even if the evidence also relates to another category of damages. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 773 (Tex.2003). Physical impairment encompasses the loss of the injured party's former lifestyle. *Dawson v. Briggs,* 107 S.W.3d 739, 752 (Tex.App.-Fort Worth 2003, no pet.).

#### 2. Evidence of Mrs. Penny's Physical Impairment

There is evidence in the record that Mrs. Penny did participate in daily activities, although she had lost some of her mobility and mental acuity. For instance, Penny testified that Mrs. Penny would get up and around and liked to socialize with her friends in the nursing home. She also played bingo and forty-two. She did have some level of mobility even when she was admitted to the emergency room March 27, 2001. After she was placed in her room following the accident, she was unable to speak or move about at all. She stayed in bed, moaning and tossing. According to Penny, she was unable even to speak. Penny testified that the day following Mrs. Penny's fall, he went to her hospital room where he took her hand and called her name. In response, Mrs. Penny looked at him and attempted to say something to him, but could not because, it appeared, she had bitten her tongue in half during the fall.

Once again, the limitation on this element of damages is not its severity, but its short duration. Mrs. Penny was deprived of her ability to communicate or function in any meaningful manner for four days before her death. Based on the short duration, we cannot find that the evidence is factually sufficient to support an award of $496,934.00, and we suggest a remittitur of $346,934.00.

### V. JURY CHARGE ERROR

In their fourth point of error, Appellants argue that we are prevented from determining whether the jury based its verdict on an invalid (i.e., on not supported by legally or factually sufficient evidence) element of damages where the court's charge failed to limit the jury's consideration only to the theories potentially supported by legally sufficient evidence of disfigurement and physical impairment.

Appellants complain of the trial court's submission of one damages blank for each of the damages elements of disfigurement and physical impairment. They argue that, since there is no evidence in the record to show any disfigurement or physical impairment before the March 27, 2001, fall, commingling the falls before March 27, 2001, in one blank broad-form submission prevents them from a meaningful presentation on appeal. They made the same objection to the trial court's submission of the jury charge.

### A. Standard of Review

 We review alleged charge error for an abuse of discretion. *See Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990).

### B. Applicable Law: Broad–Form Submission and Mixed Theories or Elements

Whenever feasible, the trial court must submit jury questions in broad form. *See* Tex.R. Civ. P. 277; *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 389–90 (Tex.2000); *E.B.,* 802 S.W.2d at 649.

Appellants rely on *Harris County v. Smith,* 96 S.W.3d 230, 234 (Tex.2002), to support their point of error. In *Smith,* the trial court submitted a damages question with four elements of damages, but with only one answer blank. *Id.* at 231–32. The Texas Supreme Court relied on *Casteel,* 22 S.W.3d 378, to hold that this submission was erroneous because the damages question mixed valid and invalid elements of damages in a single broad-form question. *Smith,* 96 S.W.3d at 234.

A similar issue was presented in *Columbia Medical Center of Las Colinas v. Bush ex rel. Bush,* 122 S.W.3d 835 (Tex.App.-Fort Worth 2003, pet. denied). The plaintiff pleaded specific negligent acts by the defendant nurse and by the defendant medical center. *Id.* at 858. The Fort Worth court noted that the specific acts at issue did not constitute separate theories of liability and that *Smith's* reasoning did not apply. *Id.*

### C. Jury Charge Did Not Mix Valid and Invalid Elements of Damages

 Here, we rely on the same distinction as that noted in *Bush.* The acts or omissions before March 27, 2001, do not constitute a theory of liability separate from the acts or omissions on March 27, 2001. Penny sued on the acts or omissions creating a pattern of neglect of Mrs. Penny while she was in the SunBridge facility. Therefore, the jury charge did not mix valid and invalid elements of damages in a single broad-form question. We overrule Appellants' fourth point of error.

## VI. PRE- AND POSTJUDGMENT INTEREST

In their final point of error, Appellants argue that the trial court's award of pre- and postjudgment interest at the rate of ten percent should be reduced to five percent pursuant to recent amendments to Tex. Fin.Code Ann. § 304.103 (Vernon Supp.2004–2005). House Bill 2415 or House Bill 4 (or both), effective June 20, 2003, and September 1, 2003, respectively, adjust the prejudgment and postjudgment interest from the rate of ten percent to the rate of five percent and apply to final judgments signed or subject to appeal on or after the effective dates of the amendments. At issue is the meaning of the phrase "subject to appeal" in the amendments.

### A. Standard of Review

 Statutory construction is a question of law that we review de novo. *In re Forlenza,* 140 S.W.3d 373, 376 (Tex. 2004). The court must begin its construction with the statute's plain language under the assumption that the Legislature tried to say what it meant and, thus, the words are the most certain guide to the Legislature's intent. *Bush,* 122 S.W.3d at 865.

### B. Relevant Dates

Judgment consistent with the jury's verdict was signed June 13, 2003. Appellants' notice of appeal was filed September 8, 2003.

## C. Applicable Law: Recent Amendments to the Texas Finance Code

House Bill 4 and House Bill 2415 amended Section 304.003(c) of the Texas Finance Code to reduce the postjudgment interest rate from ten to five percent. *See* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3435, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01, 2003 Tex. Gen. Laws 847, 862 [H.B. 4], and Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2096–97 [H.B. 2415] (current version at Tex. Fin.Code Ann. § 304.003(c) (Vernon Supp.2004)).

Each bill provides that the changes made apply in cases "in which a final judgment is signed or subject to appeal on or after the effective date of this Act." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.04, 2003 Tex. Gen. Laws 847, 862 [H.B. 4]; Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a), 2003 Tex. Gen. Laws 2096, 2097 [H.B. 2415].

In *Bush,* the Fort Worth Court of Appeals interpreted the phrase "signed or subject to an appeal on or after the effective date of the Act." *Bush,* 122 S.W.3d at 865. Applying the plain meaning of this phrase to discern the intent of the Legislature, the court concluded that the amendment applied to cases where a judgment is signed on or after the effective date of the act and "to cases where a judgment becomes subject to appeal, i.e., capable of being appealed, on or after the effective date of the Act." *Id.*

Similarly, in *City of Dallas v. Redbird Development Corp.,* 143 S.W.3d 375 (Tex. App.-Dallas 2004, no pet.), the Dallas Court of Appeals considered the effect of the amendment to Section 343.003 of the Texas Finance Code and concluded that the final judgment signed May 16, 2003, was "capable of being appealed" on that same day, which was not on or after the effective date of the amendments. *Id.* at 388–89.

## D. Judgment *Subject to Appeal* Before Amendments

We follow the same sound statutory construction as did the Fort Worth and Dallas courts. The trial court signed its final judgment June 13, 2003. Therefore, the judgment was capable of being appealed that same day, before rather than "on or after" the earliest effective date of the amendments, June 20, 2003. Accordingly, we overrule Appellants' fifth and final point of error, leaving intact the ten percent pre- and postjudgment interest.

## VII. CONCLUSION

We overrule Appellants' first point of error, holding that Appellee's expert was properly qualified to testify in this matter and that Appellants' motion to exclude Appellee's expert testimony and Appellants' argument at trial failed to preserve their complaint regarding the adequacy of Appellee's discovery response. We sustain Appellants' second point of error challenging the jury's finding that Sun was negligent in its funding of its nursing home facility. Without expert testimony as to the standard of care applicable to Sun and as to Sun's breach of that standard, the jury was without legally sufficient evidence to find that Sun was negligent in its allocation of funds to SunBridge. Given the discretion that we must give to the jury's award, we hold that there is legally and factually sufficient evidence to support damages for conscious pain and suffering and mental anguish in the amount of $1,000,000.00 and, thus, overrule Appellants' third point of error. We grant that portion of Appellants' third point of error and find that there is not factually sufficient evidence to support the jury assessments of damages for disfigurement and

impairment and suggest a remittitur of $396,934.00 concerning the disfigurement damage and $346,934.00 concerning the physical impairment damage. A new trial will be granted unless we are notified within fifteen days of the date of this opinion that the Appellee has filed the remittitur as suggested.

We overrule Appellants' fourth point of error concerning broad-form submission of damages in that this case does not involve submission of damages based on invalid theories of recovery or invalid elements of damages.

Finally, we overrule Appellants' point of error challenging the trial court's imposition of ten percent pre- and postjudgment interest. The amendments to the Texas Finance Code are not applicable to the final judgment here, which was signed before the effective dates of the amendments.

With respect to the jury's findings against Sun, we reverse the trial court's judgment and render judgment that Penny take nothing against Sun. Sunbridge was found by the jury to be twenty-five percent responsible for the injuries sustained. If Penny, within fifteen (15) days from the date of this opinion, files a remittitur of a total of $743,868.00 from the total damages, we will award Penny a recovery of $314,033.00 (twenty-five percent of the total) in damages, plus prejudgment and postjudgment interest. If Penny fails to remit as suggested, the judgment will be reversed and the cause remanded for a new trial as to Sunbridge. In all other respects, we affirm the trial court's judgment against SunBridge in favor of Penny.