

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-16-00032-CV
_____


IN THE MATTER OF THE MARRIAGE OF KERRY BRYON NOBLE
AND GAYLA RENEE NOBLE


On Appeal from the 62nd District Court
Franklin County, Texas
Trial Court No. 11797


Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

Two weeks after her marriage to Kerry Bryon Noble (Noble) in October 2014, Gayla Renee Lawrence (Lawrence) moved out of the marital home after having been physically abused by Noble. Although Noble filed for divorce around the same time, the couple reconciled, only to finally separate in May 2015. After Noble petitioned for divorce, Lawrence filed a counter-petition seeking, among other things, damages for several instances of assault during the marriage. The trial court granted the divorce on the grounds of cruelty and divided the property. Lawrence was awarded damages of $250,600.00, which included damages for disfigurement; past and future physical pain, suffering, and mental anguish; and past medical expenses. Noble does not dispute that he assaulted Lawrence, but complains only of the damages awarded against him.

We affirm the trial court's judgment because (1) sufficient evidence supports the awards for pain, suffering, and mental anguish; (2) sufficient evidence supports the award for disfigurement; (3) sufficient evidence supports the award for medical expenses; and (4) sufficient evidence supports the finding that the Rolex watch is Lawrence's separate property.

Within a few weeks of meeting Lawrence in the summer of 2014, Noble gave her a Range Rover and deeded a one-half interest in his Winnsboro home to her. During that time, Noble was living in a halfway house in Tyler following his release from prison. When he was evicted from the halfway house in June 2014 for rules violations, Lawrence and Noble moved into the Winnsboro home. Noble was arrested in July, served time in the Titus County Jail, and was released from jail October 12. The couple married October 14.

2

Noble's abuse of Lawrence began on their honeymoon. Lawrence was awakened one night at the Adolphus Hotel in Dallas[1] by Noble, who "jerked" her out of bed by her hair and threw her into the wall and across the room. Hotel staff contacted law enforcement, and the couple was asked to leave the hotel.[2] After that, Noble hit Lawrence at least three times a week. Lawrence left Noble for a short time, but reunited with him after he repeatedly promised to seek counseling and attend church. Although the couple attended several sessions of marriage counseling, Noble eventually refused to continue after the counselor witnessed Noble hitting Lawrence in the car as the couple was leaving a counseling session.

In a second attempt to persuade Lawrence to stay with him, Noble signed over to her the title to his 2010 Mercedes automobile. That gift was followed by Noble's promise to attend counseling with a new marriage counselor in December 2014. The couple visited that counselor only "a couple" of times. Then, in January, Noble inflicted a series of physical assaults on Lawrence during which Noble poured coffee on her, kicked her, hit her in the head, forced scarves down her throat, and pinned her down with his knees. As he was attempting to remove the wedding ring from Lawrence's finger, Noble told her that he was going to break her finger. Lawrence described this series of assaults as "an a** whooping"[3] and reported it to the Winnsboro police January 21, 2015.

---

[1]Before their marriage, Noble did not abuse Lawrence.

[2]Nobel's rage on this occasion was evidently incited by the fact that Lawrence—who was sleeping—did not come downstairs and look for Noble after he left the room.

[3]After a jury trial in February 2016, Noble was found guilty of assault causing bodily injury for his January 21 assault on Lawrence. The trial court instructed the jury that it must determine whether the State had proved, beyond a reasonable doubt, that Noble caused bodily injury to Lawrence on January 21, 2015, by

3

Photographs of Lawrence's injuries, taken by the Winnsboro police, depict an injury to her right arm and bruising of the left arm. Scars resulting from those injuries remain.[4] The photographs also depict bruising to the right thigh and an injury to the right shin. The resulting scarring is still visible.

Lawrence left Noble after the January assaults, but returned home in February after Noble promised to move into his mother's home. Noble, however, did not move as promised, and the frequency of the assaults increased after Lawrence returned to the couple's home. Noble would not permit Lawrence to leave the house, and he hit her five to six times a week until the assaults occurred on a daily basis. At one point, Noble hit Lawrence with a metal wall hanging, leaving a scar between her eyes.[5] In June 2015, Noble slammed Lawrence's head into the dashboard of her car, causing a black eye. He "threw [her] all over" and pinned her under the steering wheel. He

---

a. striking Gayla Noble with his hand or hands; or
b. kicking Gayla Noble with his foot or feet; or
c. shoving a scarf into the mouth of Gayla Noble with his hand or hands; or
d. pinning down the arm or arms of Gayla Noble with his knee or knees; or
e. throwing Gayla Noble to the ground; or
f. twisting the arm of Gayla Noble with the defendant's hand or hands; or
g. dragging Gayla Noble on the ground; or
h. banging the head of Gayla Noble on the floor.

[4]The record indicates that the trial court observed scar marks on Lawrence's arms.

[5]Lawrence stated that, while she is embarrassed by the scars, she is unable to afford cosmetic surgery to have them repaired.

4

choked her and hit her during that incident as well. Lawrence was able to make a 9-1-1 call, and the Hopkins County Sheriff's Department responded and arrested Noble.[6]

In August 2015, Lawrence applied for, and received, a protective order against Noble. In the attached affidavit, Lawrence described incidents of violence that happened in June of that year, as well as the abusive treatment she endured at the hands of Noble throughout the relationship. She testified that Noble hit her in the head multiple times, poured hot coffee on her, choked her multiple times, slammed her head into walls multiple times, slammed her head on tile and hardwood floors, whipped her across the back and head with an extension cord, threw objects at her, and hit her with a door jamb. Noble slammed her forehead into the dashboard of the car, causing a black eye, and sexually assaulted her. She described multiple scars on her right arm and legs from being thrown into cabinets and walls, as well as from skidding across the floor. She described the scar between her eyes as well. Lawrence stated that she was thrown on her right upper thigh so frequently that scar tissue had accumulated. Noble did not let Lawrence seek medical care for her injuries and did not permit her to attend routine medical appointments because she was bruised.

Lawrence described many instances of being locked in the house without the use of a telephone and stated that she was not permitted to call her children or talk to anyone. On one occasion, Noble let the air out of the tires on Lawrence's car so she could not drive; and he took

---

[6]The report of Noble's arrest indicates that he was charged with family violence assault while impeding breath or circulation and interference with a 9-1-1call.

her purse, driver's license, social security card, bank card, and cash. He would not permit her to get a job.

In addition, Noble verbally and emotionally abused Lawrence, telling her that she was good for nothing since she did not earn a paycheck and that she was good only for sex. He would rarely let her cook, clean, or work in the yard. She was made to sit beside Noble or lie in the bed beside him. He would not allow her the dignity of using the restroom in private. She was not permitted to answer the door. Her showers were timed, and Noble would drag her out if she was taking too long. Noble repeatedly told her that everyone hated her, including her family, his family, and the neighbors. He threatened to call Child Protective Services if she refused to do what he told her to do and told her he had "been putting meth in [her] coffee" and had a friend conduct a hair-follicle test on her, which came back positive. He threatened to use that information against her if she refused to do what he wanted her to do. Noble told Lawrence that he would kill her if she left him.

A licensed vocational nurse of twenty years, Lawrence no longer feels as if she can work in her chosen profession. She is nervous at work and questions her judgment and ability to take care of patients because she has lost her confidence, a feeling she never experienced before her marriage to Noble. Because Noble would not permit her to leave the house, Lawrence's license as a vocational nurse lapsed. Although she has since renewed her license, Lawrence is now training to begin a new job in freight brokering.[7]

---

[7]After renewing her nursing license, Lawrence began working as a charge nurse at a local nursing home in August 2015, but was laid off in April 2016.

Lawrence testified that she does not sleep well, and sleeps—when she is able—on the couch, because she feels that she needs to be alert. She is frightened of Noble and indicated that Noble "constantly had somebody doing something bad for him." Noble has "already sent somebody to [her] house once" and has threatened to "burn the house with [her] in it . . . . [H]e's told me all these horrible things he's done to people. I don't sleep." Noble frequently told Lawrence that he would bring her down and destroy her. He likewise frequently told her, "You won't walk out of here alive today." Lawrence described her feeling of being disconnected and her discomfort in going out and in communicating with people. She cries frequently and stated that crying "seems like all I ever do." Due to her lack of trust, she feels uncomfortable dating.

Lawrence testified that she endures daily physical pain in her hips and legs[8] and began being treated by a chiropractor, Tim Davis,[9] in May 2015. Photographs of Lawrence's injuries taken by Davis depict a scar between the eyes, a bruised right eye, and bruising on the right forearm. Davis diagnosed Lawrence with a neck sprain/strain, lumbar sprain, bursitis of the right hip with accumulated scar tissue, and muscle spasms. Lawrence underwent a course of physical and physiotherapy for approximately one month. Her condition improved, but it was not an "easy treat," as there were other stressors involved. Davis did not see Lawrence as much as he had planned to.

---

[8]Before the marriage, Lawrence walked five miles a day, was in good shape, and felt healthy.

[9]Coincidentally, Davis is Noble's first cousin.

7

*(1)      Sufficient Evidence Supports the Awards for Pain, Suffering, and Mental Anguish*

Noble claims that the evidence is legally and factually insufficient to support the trial court's awards of $200,000.00 for past pain, suffering, and mental anguish and $25,000.00 for future pain, suffering, and mental anguish. Noble further claims that, even if the evidence is sufficient to support an award for these elements of damage, the award is excessive.

In this case, the trial court issued findings of fact and conclusions of law.[10] Findings of fact in a case tried to the court have "the same force and dignity as a jury's answers to jury

---

[10]The pertinent findings of fact are:

> 5.      As a direct and proximate result of Kerry Bryon Noble [sic] wrongful conduct of assaulting Gayla Renee Noble, she suffered certain damages including reasonable and necessary medical expenses in the past; reasonable and necessary medical expenses that in reasonable probability will be incurred in the future; loss of earnings in the past; loss of earning capacity, diminution of earning capacity, or both that in reasonable probability will be suffered in the future; physical pain, suffering, and mental anguish in the past; physical pain, suffering, and mental anguish that in reasonable probability will be suffered in the future; disfigurement; physical impairment; and mental anguish.
>
> 6.      The Court Finds that; $250,600.00 if paid now in cash, would fairly and reasonably compensate Gayla Renee Noble, for her injuries that resulted from the assaults committed by Kerry Bryon Noble. With the following amounts for each element of the following damages:
>
> reasonable and necessary Medical expenses in the past:  $600.00
> physical pain, suffering, and mental anguish in the past:  $200,000
> physical pain, suffering, and mental anguish that in reasonable probability will be suffered in the future:  $25,000
> disfigurement:  $25,000
>
>          . . . .
>
> 9.      The Court finds and confirms that each of the following items are the separate property of Gayla Renee Noble.
>
>          . . . .
>
> Rolex Watch acquired by gift from Kerry Bryon Noble during the marriage and was delivered to Gayla Renee Noble by Kerry Bryon Noble and acceptance [sic] by Gayla Renee Noble.
>
>          . . . .

8

questions." *Lambright v. Trahan*, 322 S.W.3d 424, 430 (Tex. App.—Texarkana 2010, pet. denied) (quoting *.39 Acres v. State*, 247 S.W.3d 384, 387 (Tex. App.—Texarkana 2008, pet. denied) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991) (orig. proceeding)). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence using the same standards that are applied in reviewing the sufficiency of the evidence underlying jury findings. *Id.* In contrast, we review conclusions of law de novo. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

In evaluating the legal sufficiency of the evidence, we must determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 582 (Tex. App.—Texarkana 2012, no pet.). In looking at the evidence, we credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *City of Keller*, 168 S.W.3d at 827.

> The evidence is legally insufficient if (1) there is a complete absence of evidence of a vital fact; (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence offered to prove a vital fact; or (4) the opposite of the vital fact is conclusively established by the evidence.

*Petrohawk Properties, L.P. v. Jones*, 455 S.W.3d 753, 770 (Tex. App.—Texarkana 2015, pet. dism'd) (citing *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010)). "More than a scintilla of

---

12.     The Court finds that Gayla Renee Noble suffered substantial disruption in her daily routine and experienced a high degree of mental pain and distress that his [sic] more than mere worry, anxiety, vexation, embarrassment or anger. The Court finds that as a result, Gayla Renee Noble suffered mental anguish and will continue to experience mental anguish as a result of the assaults by Kerry Bryon Noble.

evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

When reviewing a challenge to the factual sufficiency of the evidence, we consider and weigh all of the evidence to determine whether the credible evidence supporting the finding is so weak or "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When conducting a factual sufficiency review, we may not substitute our judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Further, we review a complaint that damages are excessive for factual sufficiency. *See Mari. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) (citing *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 847–48 (Tex. 1990); *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986)).

*(a)    Pain and Suffering*

"The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Dollison v. Hayes*, 79 S.W.3d 246, 249 (Tex. App.—Texarkana 2002, no pet.). Likewise, "once the existence of some pain and suffering has been established . . . there is no objective way to measure the adequacy of the amount awarded as compensation."

*HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.). Consequently, the fact-finder has broad discretion when fixing an amount to award for pain and suffering. *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex. 1997); *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 247–48 (Tex. App.—Texarkana 2005, no pet.) (no fixed rule exists for measuring damages for pain, suffering, and mental anguish); *Marvelli v. Alston*, 100 S.W.3d 460, 482 (Tex. App.—Fort Worth 2003, pet. denied) (matters of past and future physical pain, mental anguish, and physical impairment are particularly within jury's province). Nevertheless, because the fact-finder "cannot simply pick a number and put it in the blank," there must "be some evidence to justify the amount awarded." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). We will not set aside the award on appeal, however, unless there is a clear showing of passion, prejudice, improper motive, or that the award is so excessive as to shock the conscience of the court. *Penny*, 160 S.W.3d at 247–48.

Certain types of injuries have objective manifestations that plainly support an award for pain and suffering. *Dollison*, 79 S.W.3d at 249–50. Objectively verifiable injuries like bone fractures, nerve damage, burns, lacerations, torn muscles, and concussions have been held to support an award of pain and suffering. *Id.* at 250 n.1. We find that, in this case, there is sufficient evidence of objectively verifiable injuries to support the fact-finder's award for pain and suffering. Even in the absence of direct testimony or other evidence of pain, the fact-finder is free to draw on common sense and experience to infer the existence of pain or mental anguish from the existence of an injury likely to cause suffering. *See Telesis/Parkwood Retirement I, Ltd. v. Anderson*, 462 S.W.3d 212, 239 (Tex. App.—El Paso 2015, no pet.).

11

Here, the evidence showed that Lawrence was subjected to violent, recurring, abusive assaults, which continued throughout the course of the marriage, later, on a daily basis. During the course of the marriage, Lawrence was repeatedly choked, hit, dragged, kicked, and slammed into walls and floors. She was burned with hot coffee, slammed into the dashboard of a car, pinned under the steering wheel, hit between the eyes with a metal wall hanging, and sexually assaulted by Noble. Some, but not all, of Lawrence's injuries are documented in photographs taken by law enforcement officers and Davis. Lawrence testified that she hurt every day, all the time. She endures daily physical pain in her hips and legs.

There can be no doubt, based on this evidence, that Lawrence endured pain and suffering as a result of Noble's frequent and brutal assaults. The trial court's findings are supported by the record.

*(b)* *Mental Anguish*

Mental-anguish damages must be premised on "direct evidence of the nature, duration, or severity of [the victim's] anguish, thus establishing a substantial disruption in . . . daily routine," or other evidence of "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (describing type of proof necessary to establish mental anguish in non-personal injury case). Some types of "disturbing or shocking injuries," however, such as a "threat to one's physical safety or reputation . . . have been found sufficient to support an inference that the injury was accompanied by mental anguish." *Id*. at 445; *see Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) (finding that physical and mental suffering is necessary result of serious bodily injury

12

in case concerning future mental anguish); *Country Rds., Inc. v. Witt*, 737 S.W.2d 362, 365 (Tex. App.—Houston [14th Dist.] 1987, no writ) (presumption applied to show mental anguish is natural consequence of being badly beaten before being ejected from club).

A party must demonstrate a reasonable probability that he or she will suffer compensable mental anguish in the future to support an award for future mental anguish. *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008). However, in a case involving personal injuries, as here, such injuries may provide an adequate basis to permit a jury to reasonably conclude that a plaintiff will continue to suffer substantial disruptions in daily routine of the kind that the evidence has shown the plaintiff has suffered in the past and will support an award of damages for future mental anguish. *See Ramirez*, 196 S.W.3d at 797–98; *cf. Parkway Co.*, 901 S.W.2d at 442. Mental anguish can be established through testimony from the injured party explaining how he or she felt and how his or her life was disrupted. *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.).

Here, there is objective proof of particularly disturbing events—Noble's repeated, violent, and demeaning assaults of Lawrence over the course of many months. Those assaults, as previously described, left Lawrence with various injuries which, according to her testimony, have caused her to endure daily physical pain. Such assaultive conduct, it can be reasonably inferred, likewise resulted in mental anguish. But we need not rely solely on the inference of mental anguish to support the trial court's award for this category of damages. Here, the record includes ample

13

evidence of "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co.*, 901 S.W.2d at 444.[11]

The evidence showed that Lawrence, in addition to being repeatedly assaulted, was held captive in her own home. She was cut off from all contact with her children and was not permitted to seek medical attention for her injuries. Lawrence's activities within the home were strictly supervised, her showers timed, and her restroom use monitored. She was abused physically and mentally, demeaned, sexually assaulted, and threatened with death.

Lawrence testified that she is understandably afraid of Noble, even now that she is not in his immediate presence. That fear is the result of threats against her by Noble—threats to destroy and kill her—threats which she takes seriously. She has trouble sleeping and has the compulsive desire to remain constantly alert to danger from him. Lawrence no longer feels like she relates to people well and now lacks her former confidence and self-esteem. She cries frequently and has had recurring feelings of depression and experiences of dysfunction. After her experience with Noble, Lawrence's former role as a nurse was impaired. She no longer feels "normal" and is unable to trust men. She re-lives Noble's beatings "in [her] head daily" like a "tape . . . over and over." This affects her ability to be with others, because "nobody wants to be around somebody like that."[12]

---

[11]Noble relies on *Parkway* to support his contention that the evidence is insufficient to support the award for mental anguish. Consistent with *Parkway*, however, the evidence here regarding the frequency and severity of Lawrence's injuries is probably sufficient, in and of itself, to support an inference that mental anguish accompanied those injuries. As described above, though, the record contains additional evidence that would support the trial court's award.

[12]Lawrence sought counseling for a time, but could not continue due to a lack of funds. She recognizes her need for additional counseling.

14

After reviewing all the evidence, we conclude that it is legally sufficient to support the award of damages for past and future physical pain and mental anguish. We likewise cannot say that the evidence supporting the trial court's finding of and awards for past and future physical pain and mental anguish damages is so weak or so contrary to the overwhelming weight of all the evidence as would lead us to conclude that these determinations are wrong. Finally, we find no evidence to suggest that these awards were based on passion, prejudice, or improper motive, and they are not so excessive as to shock the conscience. *HCRA of Tex., Inc.*, 178 S.W.3d at 871–72.

*(2)     Sufficient Evidence Supports the Award for Disfigurement*

Noble claims that the evidence is legally and factually insufficient to support the trial court's award of $25,000.00 for disfigurement and that, even if the evidence is sufficient to support that award, the award is excessive.

"Disfigurement has been defined as that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Penny*, 160 S.W.3d at 252 (quoting *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960)). "Disfigurement" is not limited to, but includes, scarring. *Diamond Offshore Servs. Ltd. v. Williams*, No. 01-13-01068-CV, 2015 WL 4480577, at *12–13 (Tex. App.—Houston [1st Dist.] July 21, 2015, pet. filed). Even a small scar that is covered by clothing is compensable disfigurement. *Wal-Mart Stores, Inc. v. Tinsley*, 998 S.W.2d 664, 673 (Tex. App.—Texarkana 1999, pet. denied) (recognizing that multiple Texas courts have upheld disfigurement awards for surgical scars). Moreover, evidence that a scar is embarrassing or causes shame is relevant to an

15

award for disfigurement. *See, e.g.*, *Hopkins Cty. Hosp. Dist. v. Allen*, 760 S.W.2d 341, 344 (Tex. App.—Texarkana 1988, no writ) (concerning future disfigurement).

Although there is no evidence of surgical scars in this case, there is ample evidence that Lawrence remains physically scarred from Noble's repeated assaults. Lawrence testified that she has scarring on her upper right arm and has scars "on her arms" as depicted in photographs taken by the Winnsboro Police Department following the January 2015 assault. Those scars were pointed out to the trial court. She testified that she also has a scar on her right shin, also as depicted in a photograph admitted into evidence. Finally, Lawrence testified that she has a scar between her eyes, resulting from having been struck by Noble with a metal wall hanging. That scar is also depicted in a photograph taken by Davis and in a photograph taken the day before trial. Lawrence stated that she is embarrassed by those scars, which were still present at the time of trial in March 2016.

While Noble does not contend that Lawrence does not bear the scars of his abuse, he relies on *Pendergraft v. Carillo*, 273 S.W.3d 362 (Tex. App.—Eastland 2008, pet. denied), for the proposition that there is insufficient evidence to support the trial court's finding that Lawrence suffered disfigurement. In *Pendergraft*, there was evidence that Carillo had a 2.5 centimeter laceration under his lip as the result of being struck in the face by an air compressor hose. *Id*. at 364. The court noted, however, that there was no evidence of scarring or disfigurement as a result of that injury. *Id*. at 367–68. Unlike the evidence in *Pendergraft*, the record in this case contains undisputed evidence of external scarring resulting from Noble's assaults.

16

The disfigurement award is supported by legally sufficient evidence. Additionally, we cannot say that the evidence in support of that award is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Because the evidence is factually sufficient to support an award of disfigurement damages of $25,000.00 and because that amount is not so excessive as to shock the conscience, we overrule this point of error.

*(3)* *Sufficient Evidence Supports the Medical Expense Award*

In two arguments, Noble claims the trial court's award of $600.00 in medical expenses is not supported by legally or factually sufficient evidence.

Noble initially contends that the treatment provided by Davis was apparently for some injuries Noble caused, but because there is no evidence that Lawrence's hip injury was caused by the assaults, the damage award cannot stand. We disagree.

Lawrence testified that she sought treatment from Davis in May 2015—the same month she left Noble—because she had been assaulted on a daily basis and, as a result, she hurt "all the time." Lawrence complained to Davis of neck pain, headaches, and right hip pain. She reported a history of having her head slammed into the dashboard of a car and a history of hip pain related to having been slammed into the ground by Noble. She testified that, before the marriage, she walked five miles a day, was in good shape, and was feeling healthy. On the date of her visit to Davis, Davis photographed injuries to Lawrence's face and head. He testified that it was apparent that Lawrence had been exposed to "some type of trauma" and diagnosed her with a neck strain. Lawrence's reported history and Davis' testimony indicate that Lawrence's neck strain was related

17

to and caused by Noble's assaultive behavior. Noble apparently does not challenge this causal nexus.

Noble does claim, however, that there is no medical testimony that ties Lawrence's hip pain to any action by Noble. Davis testified that Lawrence had scar tissue in her right hip: "[M]ore than likely when we see that, which I see . . . regularly, it is mostly from trauma, but it's not necessary. I couldn't pinpoint that on anything, but it could have been repetitive stress or something of that nature." We agree that this testimony, standing alone, falls short of establishing a causal nexus between Noble's assaults and the hip pain Lawrence reported to Davis.

However, medical testimony is not always required to establish the cause of an injury. The connection between a person's injuries and the cause of those injuries can be established by lay testimony if the evidence permits the use of common sense to link the act and the injury. *Sw. Bell Tel., L.P. v. Valadez*, 02-07-00129-CV, 2008 WL 425746, at \*3 (Tex. App.—Fort Worth Feb. 14, 2008, no pet.) (mem. op.) (testimony that plaintiff fell in hole and immediately felt shoulder pain, absent before fall, established causal connection between fall and shoulder injury); *Byrd v. Delasancha*, 195 S.W.3d 834, 837 (Tex. App.—Dallas 2006, no pet.) (testimony that pain started after car accident sufficient to establish causation); *see Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex. 1984) (evidence that plaintiff was in good health after returning to work from vacation, but was exposed to typesetting machine leaking chemical fumes in her office, after which she developed headaches and breathing problems, was enough for trier of fact to infer, without expert medical testimony, that release of fumes caused injury). "Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between

18

the event and the condition is sufficient proof of causation." *Byrd*, 195 S.W.3d at 837 (citing *Morgan*, 675 S.W.2d at 733).

Here, Lawrence testified to her good health and fitness before her marriage to Noble and the beginning of the assaults. During the course of the marriage, Noble threw her down on her right upper thigh so frequently that she now endures daily pain in her hip. That pain was described by Davis as "[b]ursitis." The medical diagnosis appended to Lawrence's hip pain is not determinative here. The controlling consideration is that Lawrence's testimony enabled the trier of fact to infer, without expert medical testimony, that her daily hip pain was caused by being repeatedly thrown on her hip by Noble. It is undisputed that Lawrence was free of hip pain before the assaults. That testimony is sufficient to establish causation. Accordingly, Davis' charges for Lawrence's treatment are compensable.

Noble next contends that the amount of the $600.00 medical expense award is not supported by the evidence.

"In resolving the sufficiency of the evidence to support damages, the trial court's damage award will be upheld if it is within the range of the testimony regarding the amount of damages incurred." *Seabourne v. Seabourne*, 493 S.W.3d 222, 230 (Tex. App.—Texarkana 2016, no pet.) (citing *Garza de Escabedo v. Haygood*, 283 S.W.3d 3, 6 (Tex. App.—Tyler 2009, pet. granted), *aff'd sub nom. Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011); *Cont'l Dredging, Inc. v. De-Kaizered, Inc.*, 120 S.W.3d 380, 392 (Tex. App.—Texarkana 2003, pet. denied)).

Lawrence testified that she has incurred $600.00 in medical expenses related to injuries inflicted by Noble and that she has paid "part of that" amount to Davis. In addition to seeking

19

treatment from Davis, Lawrence visited a counselor in Winnsboro on two occasions, and she believes she paid $50.00 for each visit. Noble claims, though, that Lawrence's medical expenses were only $407.00, as reflected in Davis' statement.

While it is true that Davis' billing statement reflects charges of $407.00, Lawrence's testimony, to which no objection was posed, is likewise evidence of damages. Because there was more than a scintilla of evidence to support the trial court's $600.00 award—an amount within the range of testimony regarding this category of damage—and because we cannot say the great weight and preponderance of the evidence indicates this award was improper, we overrule this point of error.

*(4)*     *Sufficient Evidence Supports the Finding that the Rolex Watch Is Lawrence's Separate Property*

In the division of property pursuant to the divorce, the trial court awarded Lawrence a Rolex watch, finding that it had been given to her by Noble. The trial court therefore characterized the watch as Lawrence's separate property. Noble disputes this characterization, claiming that it is unsupported by legally and factually sufficient evidence.

It is presumed that property possessed by spouses during or on the dissolution of marriage is community property. TEX. FAM. CODE ANN. § 3.003(a) (West 2006). This presumption can be overcome, however, by clear and convincing evidence that it is the separate property of a spouse. *See* TEX. FAM. CODE ANN. § 3.003(b) (West 2006). Property a spouse owns before marriage or acquires during marriage by gift is separate property. TEX. FAM. CODE ANN. § 3.001(2) (West 2006).

20

Here, the trial court found that Noble gave the watch to Lawrence during the marriage.[13] We therefore review the alleged characterization error to determine if this finding is supported by clear and convincing evidence.[14] Should we determine that a characterization error has been established, we must then decide if that error amounts to an abuse of discretion. *See In re Marriage of Mouncey*, 404 S.W.3d 701, 706 (Tex. App.—Texarkana 2013, no pet.) (error in mischaracterization of property in division of marital estate does not require reversal unless mischaracterization materially affects just and right division of property).

"A gift is a voluntary transfer of property to another made gratuitously and without consideration." *Id.* at 710 (citing *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007, pet. denied)). To establish the existence of a gift, the donee must establish (1) the intent to make a gift, (2) the delivery of the property, and (3) its acceptance. *Id.* The intent to make a gift must exist at the time of the transfer. *Id.* (citing *Long v. Long*, 234 S.W.3d 34, 40 (Tex. App.— El Paso 2007, pet. denied)). The donor's intent is the principal issue in the determination of whether a gift was made. *In re Marriage of Skarda*, 345 S.W.3d 665, 671 (Tex. App.—Amarillo 2011, no pet.).

---

[13]There is no evidence in the record regarding the characterization of the watch as Noble's separate property either before, or during, the marriage. We therefore presume that the watch was community property at the outset. Consequently, a gift of the watch from Noble to Lawrence would simply amount to a gift of his one-half community property interest in the watch.

[14]Lawrence contends that, in this situation, the law presumes the transfer was a gift, in reliance on *Somer v. Bogart*, 749 S.W.2d 202, 204 (Tex. App.—Dallas 1998), *aff'd sub nom. Bogart v. Somer*, 762 S.W.2d 577 (Tex. 1988) (presumption of gift when parents pay purchase price for real property and place title in name of child); *York v. Boatman*, 487 S.W.3d 635, 642 (Tex. App.—Texarkana 2016, no pet.) (deed of real property from parent to child presumed gift); and *Richardson v. Laney*, 911 S.W.2d 489, 492 (Tex. App.—Texarkana 1995, no writ) (deed of real property from parent to child is presumed gift). Those cases are distinguished from the present case in that they involve a presumption of a gift of real property to the object of one's bounty. Further, because this case involves the disposition of property in a divorce proceeding, the provisions of the Texas Family Code, previously cited, apply.

Lawrence provided the only testimony regarding ownership of the watch. She testified that Noble gave her the watch after he had assaulted her, indicating that he did not want her to leave or go to the police. Noble then removed the watch from his wrist and said, "I love this more than anything else in my world . . . . This should show you how serious I am." Following that transaction, Lawrence kept the watch. There is no evidence that Noble ever asked Lawrence to return it.[15]

Later, after the couple separated, Noble called Lawrence to ask her if anyone was aware that she had the watch. He told her that he had reported to his insurance company that the watch had been stolen from his home, along with some other things. He asked Lawrence to verify his "story." Lawrence had previously pawned the watch for $500.00 because it was "very pricey" and she was afraid it would get lost or stolen. After Noble's request to back up his story, Lawrence

---

[15]In connection with the report of insurance fraud by Noble, Lawrence was asked:

> Q. Did you have in your possession a Rolex watch?
>
> A. Yes, I did.
>
> Q. And how had you come in possession of that watch?
>
> A. He gave it to me.

Lawrence later testified:

> Q. And that was a watch that he had made a gift of you -- to you?
>
> A. Yeah. He knew I had the watch. He had given it to me. He had given me that right after -- it was, like, not long after I came back after I had left in January.
>
> . . . .
>
> Q. He gave it to you or he told you to hold it?
>
> A. No. He gave that to me.

22

retrieved the watch from the pawn shop, reported this false claim of theft to the Winnsboro Police Department, and delivered the watch to them.

Noble contends that Lawrence's testimony does not establish Noble's intent to make a gift of the watch. He relies on *Christian v. Walker*, 381 S.W.2d 675 (Tex. App.—Texarkana 1964, no writ), for the proposition that a ratiocinative[16] opinion that a gift was made in the course of a conversation has no probative value. *Id*. at 677. *Walker* involved a parol gift of land, which the alleged grantor denied having made. There, "the witnesses did not attempt to state the elder Walker's oral expressions word for word, or in substance, but . . . gave their understanding of the meaning and effect of the elder Walker's words." *Id*. at 676–77. Here, we do not face the issue of a ratiocinative opinion. Instead, the record reflects that Noble told Lawrence that he loved the watch and that he gave it to her to demonstrate how serious he was about not wanting her to leave. It is apparent that the watch remained in Lawrence's actual or constructive possession until August 2016, when Noble contacted her about filing a false insurance claim.

Noble further contends that donative intent was not established because (1) Noble filed an insurance claim regarding the watch and (2) Lawrence pawned the watch. We do not believe either of these actions speak to the issue of donative intent at the time Noble gave Lawrence the watch. Conversely, the fact that Noble filed a false insurance claim in which he reported the watch as stolen is evidence that he did not expect the watch to be returned. The fact that Lawrence pawned the watch for safekeeping sheds no light on Noble's intent to make a gift at some earlier time.

---

[16]Ratiocination is defined as "the process of exact thinking: reasoning" or "a reasoned train of thought." *Ratiocination*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006).

23

Here, there is no conflicting evidence. Noble did not testify regarding ownership of the watch or any lack of intention to give the watch to Lawrence. The trial court has great discretion in determining the weight and credibility to be accorded to the testimony and clearly believed Lawrence was a credible witness. We have reviewed the evidence in the light most favorable to the finding and conclude that a reasonable trier of fact could have formed a firm belief or conviction that a gift was intended. *See Long v. Long*, 234 S.W.3d 34, 39 (Tex. App.—El Paso 2007, pet. denied). We therefore conclude that the evidence is legally sufficient to support the trial court's finding. Likewise, in light of the entire record, the evidence is such that a fact-finder could have reasonably formed a firm belief or conviction that a gift was intended. We thus conclude that because the evidence is legally and factually sufficient, the trial court properly characterized the Rolex watch as Lawrence's separate property. In light of this determination, we need not perform a harm analysis. We overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     October 6, 2016
Date Decided:       November 4, 2016