

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00561-CV

Enrique **LOPEZ**, Individually, and as Representative of the Estate of Tristan Lopez, Deceased,
Appellant

v.

**GUIDING LIGHT, LLC**,
Appellee

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CI21729
Honorable Norma Gonzales, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: December 1, 2021

AFFIRMED

This appeal arises from the trial court's granting of Guiding Light, LLC's Texas Civil

Practice and Remedies Code section 74.351 motion to dismiss the survival and wrongful death

lawsuit filed against it by Enrique Lopez, Individually and as Representative of the Estate of

Tristen Lopez, Deceased ("Lopez").  We affirm.

## BACKGROUND

In August 2018, the Texas Department of Family and Protective Services (the

"Department") was granted temporary managing conservatorship of Lopez's fourteen-year-old

son, T.L. In that same month, T.L. was admitted to Renaissance Behavioral Center ("RBC") because he made threats of suicide. RBC later recommended T.L. "attend a residential treatment center to achieve maximum stability before attempting to place him with a foster family." On September 4, 2018, T.L. was transferred to Guiding Light, which is a residential child-care facility operated pursuant to a contract with the Department. On the evening of September 16, T.L. and another resident got into a physical altercation and a staff member called the Bexar County Sheriff's Office. The events of the evening are disputed; however, the Sheriff's incident report indicates that when the deputies arrived, staff members were performing CPR on T.L. He was transported to a hospital by EMS and died fifteen days later.

Lopez sued Guiding Light alleging wrongful death and survival claims. Lopez contended it was unclear whether T.L. died at the hands of the other resident or one of the staff members attempting to end the fight. He alleged Guiding Light was negligent because it failed to (1) properly and adequately train and supervise its employees; (2) oversee and supervise the young men entrusted to Guiding Light; and (3) exercise reasonable care to avoid a foreseeable risk of injury to others.

Guiding Light answered and filed its motion to dismiss, alleging Lopez's suit should be dismissed with prejudice because he failed to serve an expert report within the 120-day deadline set forth in section 74.351(a). Lopez responded that he was not required to file an expert report because Guiding Light was not a health care provider and his claim was not a health-care liability claim. The trial court conducted a hearing, and later signed an order granting Guiding Light's motion to dismiss with prejudice and awarding Guiding Light attorney's fees. This appeal ensued.

**STANDARD OF REVIEW**

Generally, we review a trial court's order granting or denying a motion to dismiss under section 74.351 of the Texas Civil Practice and Remedies Code for an abuse of discretion. *Am.*

*Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). However, whether a petition asserts a health care liability claim under the statute is a question of law reviewed de novo. *See Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012); *Heriberto Sedeno, P.A. v. Mijares*, 333 S.W.3d 815, 818 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "[W]hen making that determination courts should consider the entire court record, including the pleadings, motions and responses, and relevant evidence properly admitted." *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012).

## APPLICABILITY OF THE TEXAS MEDICAL LIABILITY ACT

Civil Practice and Remedies Code Chapter 74, also known as the Texas Medical Liability Act (the "Act"), requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed. TEX. CIV. PRAC. & REM. CODE § 74.351(a). The purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims. *Palacios*, 46 S.W.3d at 877; *see also Loaisiga*, 379 S.W.3d at 258 ("[Expert report] requirements are meant to identify frivolous claims and reduce the expense and time to dispose of any that are filed."). In accordance with that purpose, the Act provides a mechanism for dismissal of the claimant's suit in the event of an untimely or deficient report. TEX. CIV. PRAC. & REM. CODE § 74.351(b); *see also Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). "If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

> (1) awards to the affected physician or health care provider reasonable attorney's
> fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

TEX. CIV. PRAC. & REM. CODE § 74.351(b).

"The broad language of the [Act] evidences legislative intent for the statute to have expansive application." *Loaisiga*, 379 S.W.3d at 256. "The breadth of the statute's text essentially creates a presumption that a claim is [a healthcare liability claim] if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement." *Id.* "But the presumption is necessarily rebuttable." *Id.* "In some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (i.e., the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both." *Id.*

A healthcare liability claim contains three basic elements: (1) a physician or health care provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

In this case, Lopez did not file an expert report, and the trial court dismissed his suit with prejudice. On appeal, Lopez contends he was not required to file an expert report because Guiding Light failed to establish the Act applies to his claims. Lopez argues (1) Guiding Light is not a health care provider and (2) he is not asserting a health care liability claim. Guiding Light had the burden of establishing that it is a health care provider. *Akhter v. Smooth Sols. DFW One, LLC*, 04-

11-00263-CV, 2012 WL 3776481, at \*3 (Tex. App.—San Antonio Aug. 31, 2012, no pet.) (mem. op.). We first address whether Guiding Light is a healthcare provider.

## HEALTH CARE PROVIDER

Health care liability claims can only be asserted against physicians or health care providers. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13) (defining "health care liability claim"). Guiding Light must be a health care provider for the rebuttable presumption to apply. *See Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 758 (Tex. 2014). The Act defines "health care" to mean "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE § 74.001(10). A "health care provider" means "any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care . . .." *Id.* § 74.001(a)(12)(A). Guiding Light contends it is a healthcare provider because it is a "corporation duly licensed . . . by the State of Texas to provide health care . . .." *See id.* § 74.001(12)(A) (defining "health care provider").[1]

### A.    Is Guiding Light a Health Care Provider?[2]

As described above, the Act defines "health care provider" as a "corporation . . . duly licensed, certified, registered, or chartered by the State of Texas to provide health care," including certain persons and entities expressly listed. *Id.* § 74.001(a)(12)(A). "It is clear from the language of section 74.001(a)(12)(A) that the general requirement of being 'duly licensed, certified,

---

[1] Guiding Light also contends its "Licensed Professional Counselor" ("LPC"), Treatment Director Manuel Lozano Jr., MS, is a health care provider. However, Lopez did not file suit against Lozano; therefore, his alleged status as a healthcare provider is not relevant to whether Guiding Light is a healthcare provider.

[2] For the first time on appeal, Lopez raises several objections to certain exhibits attached to Guiding Light's motion to dismiss. Because none of the objections were brought to the trial court's attention, they are waived.

registered, or chartered by the State of Texas to provide health care' is primary to any consideration respecting similarity to the persons and entities expressly listed thereafter." *Lutheran Soc. Services of the S., Inc. v. Blount*, 05-15-00380-CV, 2016 WL 1019191, at \*7 (Tex. App.—Dallas Mar. 14, 2016, pet. denied) (mem. op.). Therefore, we begin our analysis by considering whether Guiding Light demonstrated it meets the general requirement of being "duly licensed, certified, registered, or chartered by the State of Texas to provide health care." *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(12)(A).

On appeal, Lopez urges this court to apply the reasoning in *Shiloh Treatment Center, Inc. v. Ward*, 510 S.W.3d 36 (Tex. App.—Houston [1st Dist.] 2015, no pet.), to reverse the trial court's dismissal of his claim against Guiding Light. In that case, Shiloh Treatment's license specifically listed: "Type[s] of Treatment Services[:] Emotional Disorders[,] Mental Retardation[, and] Pervasive Developmental Disorders." Shiloh Treatment argued that because its child-care license included "treatment services," it was "licensed . . . to provide health care" pursuant to the Act. *Id.* at 39. Shiloh Treatment also relied on the regulatory definition of "residential treatment center" as "[a] general residential operation for 13 or more children or young adults that exclusively provides treatment services for children with emotional disorders." *Id.* at \*4 (citing 40 TEX. ADMIN. CODE § 748.43(40)).

The court of appeals disagreed and concluded Shiloh Treatment was "not licensed to be anything other than a residential treatment center" and Shiloh Treatment had provided no evidence of what treatment services it provided. *Id.* In rejecting Shiloh Treatment's arguments, the court of appeals stated in part, "[a]lthough Shiloh Treatment was authorized to provide treatment services for emotional disorders, this alone cannot be enough to make it a health care provider." *Id.* at 40. The court observed (1) the regulatory definition cited by Shiloh Treatment "says nothing about the kind or degree of treatment services rendered" and (2) although mental care facilities

licensed under certain provisions of the Texas Health and Safety Code are specifically identified in the Act as "health care providers," Shiloh Treatment was not licensed under those provisions, but rather was licensed pursuant to the Human Resources Code. *Id.* The court also reasoned that while "[a] pedicurist may be said to 'treat' a callous; a yoga instructor may be said to 'treat' anxiety; [and] a teacher may be said to 'treat' a learning difference," "none are automatically health care providers rendering medical treatment to patients." *Id.* (citing *Skloss v. Perez*, No. 01–08– 00484–CV, 2009 WL 40438, at *4 (Tex. App.—Houston [1st Dist.] Jan. 8, 2009, no pet.) (mem. op.) (licensed professional counselor was health care provider because she was licensed to provide medical treatment to patients)). Additionally, the court stated in part,

> . . . According to [the Department], treatment services are "a specialized type of child-care services designed to treat and/or support children." . . . "Child-care services [means] services that meet a child's basic need for shelter, nutrition, clothing, nurture, socialization, and interpersonal skills, care for personal health and hygiene, supervision, education, and service planning." . . . This suggests that these services are general in nature and not medical services.
>
> . . .
>
> In addition, the record contains no evidence that Shiloh Treatment actually provided any medical care or treatment to Ward or any other person. There is no indication of how many members of Shiloh's staff, if any, were medical personnel. There is no evidence regarding the extent that medical personnel controlled or influenced any child-care services rendered to Ward. There is no medical documentation from Shiloh Treatment in the record. . ..
>
> . . .
>
> Given the sparse record evidence, we cannot conclude that Shiloh Treatment was "duly licensed, certified, registered, or chartered by the State of Texas to provide health care."

*Id.* at 39-40 (citations omitted).

As in *Shiloh*, Guiding Light asserted that it is licensed by the Texas Health and Human Services Commission and "has been issued a license to operate as a General Residential Operation – Residential Treatment Center Under the Provisions of Chapter 42, Human Resources Code."

As a "General Residential Operation—Residential Treatment Center" and, as part of its licensing and pursuant to Texas Human Resources Code section 40.058, it entered into a Residential Child-Care Contract with the Department. Whether Guiding Light is a health care provider requires this court to examine the type of operation Guiding Light was licensed to operate and determine the type of services it was licensed to provide. The answers to these questions are found in the Texas Human Resources Code and the Texas Administrative Code.

**1. Type of operation**

The Department's Child-Care Licensing Division licensed Guiding Light as a residential treatment center, which is a type of "general residential operation." *Shiloh*, 510 S.W.3d at 39. "[R]esidential treatment centers" ("RTCs") are defined as "[a] general residential operation for 13 or more children or young adults that exclusively provides treatment services for children with emotional disorders." 26 TEX. ADMIN. CODE § 748.43(55); *see also id.* § 748.5 (defining RTC as "general residential operations that provide treatment services to children with emotional disorders."). "RTCs, by definition, must always comply with the rules of this chapter as if 100% of the children in their care require treatment services for emotional disorders." *Id.* § 748.5. "This includes, but is not limited to, services to individual children, personnel requirements, and child/caregiver ratio requirements." *Id.*

A "general residential operation" is "a child-care facility that provides care for seven or more children for 24 hours a day, including facilities known as residential treatment centers and emergency shelters." TEX. HUM. RES. CODE § 42.002(19); *see also* 26 TEX. ADMIN. CODE § 748.43(27) (defining "general residential operation" as "A residential child-care operation that provides child care for 13 or more children or young adults. The care may include treatment services and/or programmatic services. These operations include formerly titled emergency shelters, operations providing basic child care, residential treatment centers, and halfway

houses."). A "child-care facility" is defined to mean "a facility licensed, certified, or registered by the department to provide assessment, care, training, education, custody, treatment, or supervision for a child who is not related by blood, marriage, or adoption to the owner or operator of the facility, for all or part of the 24-hour day, whether or not the facility is operated for profit or charges for the services it offers." *Id.* § 42.002(4). A "residential child-care facility" is defined to mean "a facility licensed or certified by the department that operates for all of the 24-hour day. The term includes general residential operations, child-placing agencies, specialized child-care homes, cottage home operations, continuum-of-care residential operations, and agency foster homes." *Id.* § 42.002(19).

However, these definitions say nothing about the degree of treatment services rendered or the severity of emotional disorders treated. *See Shiloh*, 510 S.W.3d at 40 (holding same). Therefore, we next look to the types of services Guiding Light was licensed to provide.

## 2. Types of services

The Administrative Code "set[s] forth rules that apply to General Residential Operations and Residential Treatment Centers." 26 TEX. ADMIN. CODE § 748.1. Licenses issued under Chapter 748 regulate several types of services, including:

> (1) Child-Care Services—Services that meet a child's basic need for shelter, nutrition, clothing, nurture, socialization and interpersonal skills, care for personal health and hygiene, supervision, education, and service planning;
>
> (2) Treatment Services—In addition to child-care services, a specialized type of child-care services designed to treat and/or support children:
> > (A) With Emotional Disorders who have a current DSM-5 diagnosis, such as mood disorders, psychotic disorders, or dissociative disorders, and demonstrate two or more of the following:
> > (i) Major self-injurious actions, including a suicide attempt within the last 12 months;
> > (ii) Difficulties that present a significant risk of harm to others, including frequent or unpredictable physical aggression; or

>> (iii) An additional DSM-5 diagnosis of substance-related and/or addictive disorder with severe impairment . . ..

*Id.* § 748.61(1), (2).

Guiding Light's license describes the "services" as "childcare" and the "treatment services" as "emotional disorders." The "children served" are boys ranging in age from six years old to seventeen years old, with a "capacity" of seventy-six children. In its motion to dismiss, Guiding Light contended it provided T.L. with professional mental health treatment for his severe emotional and mental disorders. A license to provide treatment services for emotional disorders "alone cannot be enough to make [Guiding Light] a health care provider"; *see Shiloh*, 510 S.W.3d at 40; and nothing in Guiding Light's license or in the statutory definitions of residential treatment centers specifically describe the "treatment services" it is licensed to provide. However, our standard of review requires us to review the entire record; therefore, we must look to other evidence in the record to determine the types of services Guiding Light was licensed to provide.

"Nothing in [Civil Practice and Remedies Code] section 74.001 distinguishes between mental and physical health care." *Fudge v. Wall*, 308 S.W.3d 458, 462 (Tex. App.—Dallas 2010, no pet.). The Act defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10). "Health care includes the care and treatment of mental conditions." *Fudge*, 308 S.W.3d at 462; *Mike Norgaard, LPC v. Pingel*, 296 S.W.3d 284, 288 (Tex. App.—Fort Worth 2009, no pet.) (same); *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 850 (Tex. 2005).

Guiding Light relied on the Residential Child-Care Contract it entered into with the Department to demonstrate the mental health treatment services it was authorized to offer.[3] The contract stated the goal of residential child care was, in part, "to protect the well-being of the Child, enhance the Child's functional abilities in a 24-hour residential child-care setting, and prepare the Child for his/her Permanency Goal, by providing the following services as appropriate:"

> A) Child-Care and Treatment Services;
> B) Service Planning for educational, recreational, vocational, transitional and Basic Life Skills;
> C) Behavioral Health, diagnostic assessment, and health/preventive health care services; . . ..

The contract also provided, in part, as follows:

> [The Department] will determine the minimum services provided by the Contractor [such as Guiding Light] to each Child based on the Child's level of need. The Department will designate the level of need as Basic, Moderate, Specialized, or Intense, as described in Attachment C. The Contractor must provide services to Children authorized at the Specialized and Intense Service Levels, and must maintain full compliance with the associated Service Levels as described in Attachment C for each Child placed with the Contractor.

The components of the contract included, among other things, that the contractor provide diagnostic assessments, develop, coordinate, and implement a service plan that supports the

---

[3] The Department "may enter into contracts or agreements with any person, including a federal, state, or other public or private agency, as necessary to perform any of the department's powers or duties." TEX. HUM. RES. CODE § 40.058(a). "A contract for residential child-care services provided by a general residential operation . . . must include provisions that:
(1) enable the department and commission to monitor the effectiveness of the services;
(2) specify performance outcomes, financial penalties for failing to meet any specified performance outcomes, and financial incentives for exceeding any specified performance outcomes;
(3) authorize the department or commission to terminate the contract or impose monetary sanctions for a violation of a provision of the contract that specifies performance criteria or for underperformance in meeting any specified performance outcomes;
(4) authorize the department or commission, an agent of the department or commission, and the state auditor to inspect all books, records, and files maintained by a contractor relating to the contract; and
(5) are necessary, as determined by the department or commission, to ensure accountability for the delivery of services and for the expenditure of public funds.
*Id.* § 40.058(f).

Department's permanency plan for the child and address the services that would be offered to a child to meet the child's specific needs.

T.L. was admitted for "specialized care," which the contract described as follows:

1) The Specialized Service Level consists of a treatment setting, preferably in a family, in which Caregivers have specialized training to provide services that help a person keep, learn or improve skills and functioning for daily living, therapeutic and medical support and interventions including:

A. 24-hour supervision to ensure the Child's safety and sense of security, which includes close monitoring and increased limit setting;
B. Affection, reassurance, and involvement in therapeutic activities appropriate to the Child's age and development to promote the Child's well-being;
C. Contact, in a manner that is deemed in the best interest of the Child, with family members and other persons significant to the Child to maintain a sense of identity and culture; and
D. Requires services that help a person keep, learn or improve skills and functioning for daily living, therapeutic and medical intervention and guidance that is regularly scheduled and professionally designed and supervised to help the Child attain functioning appropriate to the Child's age and development.

2) In addition to the description in Subsection 1) of this Section, a Child with primary medical needs or a Child that requires services that help a person keep, learn or improve skills and functioning for daily living, including regular interventions from a Skilled Caregiver who has demonstrated competence.

The specialized service level plan also required that

S501.01 An initial service plan for each Child is developed within 72 hours of the Child's admission.
S501.02 The diagnostic needs assessment and service plan for each Child are developed by an interdisciplinary team or a full-time staff member with three years of experience in treating Children with similar characteristics who has a master's degree in a mental health field from an accredited college or university and is licensed as a therapist or counselor or has a professional medical license.
. . .
The contract required that, in addition to the service plan requirement at the specialized service level, a service provider "expand the service plan to cover all of the Child's waking hours and include:"

1501.01 A description of the emotional, behavioral, and physical conditions that require intense services;

1501.02 A description of the emotional, behavioral, and physical conditions the Child must achieve and maintain to be assigned to a lower Service Level;

1501.03 A description of the special treatment program and other services and activities that are planned to help the Child achieve and maintain a condition allowing a lower Service Level;

1501.04 Criteria for re-evaluating the Child's condition after 90 days and deciding whether to continue the placement at the Intense Service Level; continue the placement at a lower Service Level; transfer the Child to a less restrictive setting; or refer the Child to an inpatient hospital; and,

1501.05 The provider must ensure that an interdisciplinary team of professionals develop, review, and supervise each Child's service plan

Additionally, specialized service level employees were required to "arrange[] for interventions such as individual, group, and family therapy to be conducted by professional therapists; or behavior or medical intervention as directed by the service plan."

We conclude Guiding Light's evidence established it was licensed to offer mental health treatment. Therefore, the next question is whether Guiding Light provided evidence to the trial court that it actually provided such treatment to T.L. *See Shiloh*, 510 S.W.3d at 39 ("In addition, the record contains no evidence that Shiloh Treatment actually provided any medical care or treatment to Ward or any other person.").

**B.      Did Guiding Light Provide Mental Health Treatment?**

The Department's "Application for Placement of Children in Residential Care" indicated T.L. had "mental health needs requiring treatment." The application recommended "specialized" level of care because T.L. had suicidal ideations/self-harming behaviors, had been diagnosed with ADHD, Tourette's Disorder, and major depression "episode without psychosis." He also was alleged to have a history of assaultive behavior, including choking his two-year-old female sibling and killing animals. The application listed the immediate goals of placement as providing T.L. with a safe environment, the basic needs of food, clothing, and shelter. Long term goals included providing him "with extensive therapy to address the underlying issues that led to the removal and

to provide the child with life techniques so that he can have an opportunity to become a productive citizen."

As outlined, Guiding Light's admission assessment of T.L. listed his level of care as "specialized," and noted the same history as contained in the Department's application. The assessment noted: "[T.L.] has mental health needs requiring treatment. [T.L.] is diagnosed with Attention Deficit/Hyperactivity Disorder of the Combined Presentation and Major depressive disorder, Recurrent episode, Severe without psychosis. [T.L.] has no substance abuse history." The assessment stated T.L. would "be examined by a physician while in placement at Guiding Light to determine medical needs" and as follows:

> V. OBJECTIVE OF PLACEMENT The objectives of this placement are to protect [T.L.] from abuse and neglect and to provide [T.L.] with care that meets his needs for permanency and belonging.
>
> BASIC NEEDS [T.L.] has basic needs and requires food, shelter, and clothing; He will also receive routine medical and dental care, a safe stimulating and nurturing home environment that will include friendships and recreational activities.
>
> Short-term Goals of Placement: The short-term goals of this placement are for [T.L.] to receive regular medical and dental care, and be provided with a safe environment. [T.L.] will be emotionally stable and demonstrate good social skills. [T.L.] will attend school regularly and participate in social and recreational activities.
>
> Long-term Goals of Placement: [T.L.'s] long term goal for placement is independent living skills and to maintain overall good physical, dental and medical health. [T.L.] will demonstrate behavioral control and maintain positive relationships. [T.L.] will learn to verbalize his feelings appropriately. Also, [T.L.] will successfully complete school and will demonstrate good social skills.

The assessment stated T.L. would "receive anger management techniques, problems solving skills, and learn to interact positively with peers to de-escalate negative behaviors." Guiding Light's staff would "positively redirect [T.L.'s] behavior by being consistent with the facility's rules and consequences, as well as promoting fair practices[; and p]rovide commands that are brief, calm, and non-confrontational." The assessment also stated Guiding Light's

therapist would "maintain regular individual and group therapy sessions to address [T.L.'s] behavior, problems solving skills, positive interactions with peers, impulse control, and provide anger management techniques."

Guiding Light also provided a "72-Hour Treatment Plan," which stated: "[T.L.] will need coping skills/techniques to help to manage his anger and obtain positive social skills, increase impulse control as well as problem solving and decision-making techniques." The plan described T.L.'s "treatment services" as follows:

> [T.L.] will receive individual therapy to work on his aggression, impulsivity, depression and suicidal ideation. He will also need to understand how his actions produce both negative and positive consequences from the caregivers. [T.L.] needs to be involved in a structured recreational experience with peers in order to practice positive social skills and develop friends. His therapy would also address [T.L.'s] cognitive/academic needs and/or deficits.
>
> . . .
>
> [T.L.] will receive weekly individual and group therapy. He will also receive appropriate psychological evaluations and monthly medication monitoring.

The plan listed the same responsibilities for its staff and therapists as listed on the admission assessment. The "transitional living" section of the plan stated

> As a resident of Guiding Light Residential Treatment Center, [T.L.] will participates [sic] in individual therapy, group therapy, and staff daily groups that will teach him problem solving, stress management, assessing consequences, establishing goals and planning for the future. While at Guiding Light he will be required to complete weekly chores such as washing dishes, sweeping, mopping, taking the trash out, cleaning windows and/or assisting with setting the table, this will teach him everyday life skills. Once [T.L.] turns 16 y/o, his caseworker will submit a referral to PAL classes and a referral for Circle Of Support.

An "Individual Therapeutic Services Report," completed by Guiding Light's Treatment Director, Manuel Lozano Jr., who is a licensed professional counselor, stated

> This therapist [Lozano] inquired about what [T.L.] feels he needs to focus on while in treatment. [T.L.] reported that he feels he needs to focus on "Depression and Anger." This therapist explained to [T.L.] that he and this therapist would explore his behaviors, recommendations from [the Department], and put together a

treatment plan. This therapist reviewed the expectations of the facility and how to successfully adjust to the facility. This therapist also reviewed the rules of the facility. [T.L.] indicated that he understood and added that if he can't stay here until he is 18 years old he will probably go to a foster home. Rapport was established.

. . .

[T.L.] is seen in individual therapy on a weekly basis for 45 minute sessions. The sessions take place in the RTC. He also participates in 45-minute group session on a weekly basis.

Finally, Guiding Light attached to its motion to dismiss the affidavits of Lozano and its Executive Director, Phyllis Bartell. Lozano attested he held three individual therapy sessions with T.L. in September 2018 and created T.L.'s treatment plan based on T.L.'s medical history and individual interview sessions. Lozano also stated that, in addition to his services, the medical team consists of a psychiatrist, who is available via Telemed and sees each resident once every sixty days or as needed, to assist in treating the psychiatric wellbeing of the residents. Bartell attested that "[p]sychiatric treatment through our psychiatrist consultant & his/her colleagues is available 24 hours a day, seven days a week."

We conclude Guiding Light established it is a health care provider based on (1) its license to provide "treatment services" for "emotional disorders," (2) the Department's application for placement that listed as a long term goal providing T.L. "with extensive therapy to address the underlying issues that led to the removal and to provide the child with life techniques so that he can have an opportunity to become a productive citizen," (3) its contract with the Department to provide these services, and (4) the evidence that it did, in fact, provide these services to T.L. Therefore, we next examine whether Lopez's claim is based on facts implicating Guiding Light's conduct during T.L.'s care and treatment. If it is, then we apply the rebuttable presumption that the claim is a health care liability claim.

**HEALTH CARE LIABILITY CLAIM**

One of the elements of a healthcare liability claim is that the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

Generally, we review a trial court's order granting a motion to dismiss for failure to timely file a section 74.351(a) expert report under an abuse of discretion standard; however, "[t]he nature of the claims the Legislature intended to include under the [Act's] umbrella is a matter of statutory construction, a legal question we review de novo." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 177; *see also Bioderm*, 426 S.W.3d at 757; *Akhter*, 2012 WL 3776481, at *1 (citations omitted) (as a general rule, "we review a trial court's order granting a motion to dismiss for failure to timely file a section 74.351(a) expert report under an abuse of discretion standard"; however, "when the issue requires a determination of whether Chapter 74 applies to a claim, the issue is one of statutory interpretation that we review de novo"). "In construing a statute, our aim 'is to determine and give effect to the Legislature's intent,' and we begin with the 'plain and common meaning of the statute's words.'" *Tex. W. Oaks Hosp.*, 371 S.W.3d at 177 (citations omitted).

The Act's broad language "evinces legislative intent for the statute to have expansive application." *Bioderm*, 426 S.W.3d at 758. In determining whether Lopez's claim is a health care liability claim, we focus on the underlying nature of the cause of action and we are not bound by the pleadings. *Diversicare*, 185 S.W.3d at 847. Artful pleading does not alter that nature. *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010). A claim based on one set of facts cannot be spliced or divided into both a healthcare liability claim and another type of claim. *See id.* at 197; *Diversicare*, 185 S.W.3d at 854. Thus, claims premised on facts that could support claims against a physician or health care provider for departures from accepted standards of medical care, health

care, or safety or professional or administrative services directly related to health care are healthcare liability claims, regardless of whether the plaintiff alleges the defendant is liable for breach of any of those standards. *See Loaisiga*, 379 S.W.3d at 255.

"In defining the types of claims against health care providers constituting [health care liability claims], the question we face is not whether it seems that a claimed injury really arose from treatment commonly understood to be some type of medical or health care; nor do we address whether the incident causing the injury would have been a common law negligence claim." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 179. "Instead, the issue posed is whether the umbrella fashioned by the Legislature's promulgation of the [Act] includes the cause of action brought by a claimant against physicians or health care providers." *Id.* "[W]e determine whether the relevant allegations are negligence claims or are properly characterized as [healthcare liability claims] under the Act." *Id.* In making the determination, we consider the entire court record, including the pleadings, motions and responses, and relevant evidence properly admitted. *Id.* at 258.

There are several types of healthcare liability claims set forth in the Act. In addition to claims involving treatment and lack of treatment, the Act contemplates claims for alleged "departure[s] from accepted standards of medical care, or health care, or *safety* or professional or administrative services directly related to health care." Tex. Civ. Prac. & Rem. Code § 74.001(a)(13) (emphasis added). All these categories of claims, except safety, are defined terms in the Act. *See, e.g., id.* § 74.001(a)(10), (a)(19), and (a)(24) (defining "health care," "medical care," and "professional or administrative services"). Guiding Light asserts Lopez's claims allege departures from accepted standards of "safety." Lopez argues his claim is for ordinary negligence and his claim relates to Guiding Light's failure to act as a reasonably prudent child-care center would under the same or similar circumstances in its supervision of T.L.

The Act "does not specifically state that a safety standards-based claim falls within its provisions only if the claim has some relationship to the provision of health care other than the location of the occurrence, the status of the defendant, or both." *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 504 (Tex. 2015). "But the Legislature must have intended such a relationship to be necessary, given the legislative intent explicitly set out in the [Act] and the context in which 'safety' is used in the statute." *Id.* The *Ross* Court concluded that, "[c]onsidering the purpose of the statute, the context of the language at issue, and the rule of ejusdem generis, . . . the safety standards referred to in the definition are those that have a substantive relationship with the providing of medical or health care." *Id.* "And if it were not so, the broad meaning of 'safety' would afford defendant health care providers a special procedural advantage in the guise of requiring plaintiffs to file expert reports in their suits regardless of whether their cause of action implicated the provision of medical or health care." *Id.* The Court did not believe the Legislature intended the statute to have such arbitrary results. *See id.*

"The pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties to provide for patient safety." *Id.* at 505. The line between a safety standards-based claim that is not a healthcare liability claim and one that is "may not always be clear." *Id.* "But certain non-exclusive considerations lend themselves to analyzing whether such a claim is substantively related to the defendant's providing of medical or health care and is therefore a healthcare liability claim":

> 1. Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;
> 2. Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;
> 3. At the time of the injury was the claimant in the process of seeking or receiving health care;

4. At the time of the injury was the claimant providing or assisting in providing health care;

5. Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;

6. If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; or

7. Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Id.*

"When we examine these factors or considerations, we focus on the essence of the cause of action." *Nexion Health Mgmt., Inc. v. Waddell*, 05-20-00406-CV, 2020 WL 7767938, at *2 (Tex. App.—Dallas Dec. 30, 2020, no pet.) (mem. op.). "For example, is the claim an ordinary negligence claim or is the claim a health care liability claim as contemplated by the Legislature when it provided for health care liability claims in the [Act]?" *Id.* Here, the pivotal issue is whether the safety standards implicated Guiding Light's duties as a health care provider.

In his petition, Lopez brought a negligence claim against Guiding Light based on the following factual allegations:

> This case arises out of a catastrophic incident that occurred at a group home for young men on or around September 16, 2018 in San Antonio, Texas. On that date, [T.L.] was fatally injured while living at a group home owned and operated by the Defendant and located at 17602 Tucker Place, San Antonio, Texas 78221. Specifically, and based on information and belief, [T.L.] and other young men at the home were not adequately supervised, began to fight, and during the fight or soon after, [T.L.] passed away. It is unclear at this time whether [T.L.] died at the hands of another young man living at the home or at the hands of one of the employees attempting to break up the fight. Either way, Guiding Light failed to provide [T.L.] and its employees with adequate supervision, adequate training, or a safe home environment.

Lopez alleged Guiding Light breached its duty of care by failing to (1) properly and adequately train and supervise its employees; (2) properly oversee and supervise the young men entrusted to it; and (3) exercise reasonable care to avoid a foreseeable risk of injury to others. Because we have already determined Lopez's claim satisfies the first element of a health care

liability claim because Guiding Light is a health care provider, and Guiding Light did not dispute that the third element of a health care liability claim (causation of the injury) was not satisfied, Lopez may only rebut the presumption that his claim is a health care liability claim by proving his claim does not constitute an alleged "departure[ ] from accepted standards of medical care or health care." *See Bioderm*, 426 S.W.3d at 759. Thus, we must determine whether Lopez's claims alleging Guiding Light failed to provide T.L. and its employees with adequate supervision, adequate training, or a safe home environment implicate one or more of the standards listed in the Act's definition of a healthcare liability claim.

"When a plaintiff only alleges ordinary negligence against a health care provider, courts have concluded the plaintiff did not assert a safety standard-based" healthcare liability claim. *Tex. Health Res. v. Coming Attractions Bridal & Formal, Inc.*, 552 S.W.3d 335, 340 (Tex. App.—Dallas 2018), *aff'd*, 595 S.W.3d 659 (Tex. 2020). "Those cases generally involve injuries related to the health care provider's duties as a premises owner—duties owed by any business premises owner to those lawfully entering the property—and wholly unrelated to the rendition of health care. Because there was no substantive nexus between the safety standards allegedly breached and the provision of healthcare in those cases, the claims were not considered" healthcare liability claims. *Id.* (and cases cited therein). Unlike the allegations of ordinary negligence in these cases, Lopez's allegations are not merely related to Guiding Light's duties as a premises owner or wholly unrelated to the rendition of health care. Guiding Light's alleged negligence is based on safety standards uniquely arising from professional duties owed as a health care provider. *See id.* at 340. We conclude Lopez alleged departures from safety standards that implicate Guiding Light's duties as a health care provider; therefore, Lopez asserts a healthcare liability claim. Our conclusion is further supported by the *Ross* Court's non-exclusive list of considerations for analyzing whether a

claim is substantively related to a health care provider's provision of medical or health care and, therefore, a healthcare liability claim.

Four of the *Ross* factors support our conclusion that Lopez asserts a safety standards-based healthcare liability claim, two factors do not, and one does not apply because no instrumentality was involved in the alleged negligence. As to the first and second factors, Lopez alleged Guiding Light failed to "properly oversee and supervise the young men entrusted to it" while T.L. was living at Guiding Light's facility. These allegations assert Guiding Light's alleged negligence occurred in the course of Guiding Light performing tasks with the purpose of protecting its residents from harm in a place where residents might be during the time they were receiving care. Therefore, the first and second factors weigh in favor of finding that Lopez's claim is a healthcare liability claim.

The third factor requires evidence that, at the time of the injury, T.L. was in the process of seeking or receiving health care. Guiding Light argued peer interaction and structured recreational experiences with other residents was part of T.L.'s treatment plan and, at the time of the incident, T.L. and other residents were in Guiding Light's living room area. On appeal, Guiding Light suggests that "wrestling with another resident in the living room area . . . certainly could be considered a recreational experience with peers of the type recommended by Lozano in T.L.'s treatment plan." Nothing in the record indicates any such recommendation was made and Guiding Light points to no other evidence that therapists or other healthcare workers were present during the incident. Therefore, the third factor weighs against a finding that Lopez's claim is a healthcare liability claim. The fourth factor also weighs against such a finding because there is no evidence Guiding Light was in the process of providing or assisting in providing health care when the incident occurred. The sixth factor does not apply because no instrumentality was involved in the alleged negligence.

The fifth and seventh factors require evidence regarding whether the alleged negligence (1) is based on safety standards arising from professional duties owed by Guiding Light and (2) occurred in the course of Guiding Light's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies. The gravamen of Lopez's claim is Guiding Light failed to provide adequate supervision of T.L. and provide for a safe home environment, and failed to adequately train its staff. These allegations implicate both an alleged departure from the accepted standards of safety, and that T.L.'s health care provider violated the standard of health care owed to Guiding Light's residents. Thus, the fifth and seventh factors weigh in favor of a finding that Lopez's claim is a healthcare liability claim.

Furthermore, expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of laypersons. "[I]n considering whether a claim alleges a departure from accepted standards of medical or health care, a court should first determine whether expert medical or health care testimony is needed to establish the requisite standard of care and breach." *Bioderm*, 426 S.W.3d at 760. "And only if expert testimony is not needed should a court proceed to consider the totality of the circumstances, as a claim may still be a health care liability claim despite that 'in the final analysis, expert testimony may not be necessary to support a verdict.'" *Id.*

How a health care provider trains its employees and the steps a provider such as Guiding Light must take to ensure a safe environment for its residents would likely fall outside a layperson's common knowledge. The range of alternatives available to a provider such as Guiding Light requires medical judgment to select and implement. We, therefore, conclude an expert was required at least as to some of the allegations in Lopez's petition.

While not all the *Ross* factors indicate Lopez asserts a safety standards-based healthcare liability claim, the factors that do weigh strongly in favor of our conclusion that expert testimony is required to prove or refute his claim. *See SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 246 (Tex. App.—Texarkana 2005, no pet.) (necessity of expert on issue of corporate funding, nursing home budgets, and staffing level standards); *see also Rehabilitative Care Sys. of Am. v. Davis*, 73 S.W.3d 233, 234 (Tex. 2002) (per curiam) (disapproving of court of appeals statement that negligent supervision claim against physical therapist could be determined without the aid of expert testimony). We therefore conclude the record before us does not rebut the presumption as it relates to the Act's expert report requirements.

## CONCLUSION

Because Lopez's claim is a health care liability claim, it is subject to Civil Practice and Remedies Code section 74.351. Lopez was therefore required to timely file an expert report within 120 days of Guiding Light's original answer. He failed to do so; consequently, the trial court correctly dismissed the suit with prejudice. Accordingly, we affirm the trial court's dismissal with prejudice of Lopez's claims.

Lori I. Valenzuela, Justice